# In the United States Court of Appeals for the First Circuit

---

## United States of America,
### Appellee

### v.

## Haoyang Yu,
### a/k/a Jack Yu, a/k/a Harry Yu, a/k/a Jack Tricon,
### Defendant-Appellant

---

### On Appeal from a Judgment in a Criminal Case,
### Entered in the United States District Court
### For the District of Massachusetts

---

### Brief for the United States

---

Leah B. Foley
United States Attorney

Karen Eisenstadt
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210
(617) 748-3412

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF JURISDICTION............................................................................ 1

STATEMENT OF ISSUES ......................................................................................... 1

STATEMENT OF THE CASE...................................................................................... 2

      A.     Offense Facts ................................................................................. 2

      B.     Procedural Overview .................................................................... 7

SUMMARY OF ARGUMENT ................................................................................... 8

ARGUMENT ............................................................................................................... 9

I.      THE DISTRICT COURT DID NOT ERR IN DENYING YU'S MOTION TO DISMISS THE INDICTMENT BASED ON SELECTIVE PROSECUTION OR ENFORCEMENT ............................................................................................. 9

      A.     Procedural History ........................................................................ 9

      B.     Standard of Review........................................................................ 11

      C.     The Court Did Not Err in Denying Yu's Selective Prosecution Claim ............... 12

      D.     The Court Did Not Err in Denying Yu's Selective Enforcement Claim .............. 19

             1.     No Discriminatory Effect........................................................ 20

             2.     No Discriminatory Purpose..................................................... 25

II.     THE WORDING OF COUNT ONE DOES NOT REQUIRE REVERSAL, AND THE EVIDENCE WAS SUFFICIENT TO PROVE THE OFFENSE............................ 29

      A.     Procedural History ........................................................................ 29

      B.     Standard of Review........................................................................ 29

      C.     Statutory Framework .................................................................... 30

D.      Yu's Challenge Regarding the Wording of Count One Is Not a Claim of Insufficiency or Constructive Amendment, and Any Claim of Prejudicial Variance is Both Waived and Meritless ................................................................ 33

E.      The Evidence Was Sufficient to Show the Count One Trade Secret Was "Not . . . Readily Ascertainable" from the For-Sale HMC1022A Chip ............... 37

F.      The Evidence Was Sufficient to Show the HMC1022A Prototype Design Yu Possessed "Derive[d] Independent Economic Value . . . from Not Being Generally Known [or] Readily Ascertainable" .......................................... 42

G.      Section 1832 Does Not Require the Defendant to "Know[]" that the Information Possessed Qualifies As a "Trade Secret" under the Statute .............. 47

CONCLUSION ....................................................................................................... 49

CERTIFICATE OF COMPLIANCE ....................................................................... 50

CERTIFICATE OF SERVICE ................................................................................ 51

# TABLE OF AUTHORITIES

## CASES

*Allstate Ins. Co. v. Fougere*,
   79 F.4th 172 (1st Cir. 2023) ........................................................... 32, 46

*Alston v. Int'l Ass'n of Firefighters, Loc. 950*,
   998 F.3d 11 (1st Cir. 2021) ...............................................................14

*Analog Devices, Inc. v. Macom Tech Solutions Holdings, Inc.*,
   No. 18-cv-11028 (D. Mass. July 16, 2018) ...........................................15

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*,
   663 F.3d 966 (8th Cir. 2011) ...................................................... 31-32

*Boeing Co. v. Sierracin Corp.*,
   108 Wash.2d 38, 738 P.2d 665 (1987) ..................................................46

*Bostock v. Clayton Cnty., Georgia*,
   590 U.S. 644 (2020) .........................................................................21

*Computer Care v. Serv. Sys. Enters., Inc.*,
   982 F.2d 1063 (7th Cir. 1992) .............................................................46

*Conley v. United States*,
   5 F.4th 781 (7th Cir. 2021) ......................................................... 12, 19

*Electro-Craft Corp. v. Controlled Motion, Inc.*,
   332 N.W.2d 890 (Minn. 1983) ............................................................32

*Mallet & Co. Inc. v. Lacayo*,
   16 F.4th 364 (3d Cir. 2021) ................................................................32

*McGuire v. Reilly*,
   386 F.3d 45 (1st Cir. 2004) ................................................................27

*Musacchio v. United States*,
   577 U.S. 237 (2016) .........................................................................47

*Naumovski v. Norris*,
   934 F.3d 200 (2d Cir. 2019) ...............................................................27

iii

*Russello v. United States*,
464 U.S. 16 (1983) ........................................................................47

*United States v. Alcaraz-Arellano*,
441 F.3d 1252 (10th Cir. 2006) ....................................................19

*United States v. Armstrong*,
517 U.S. 456 (1996) ............................................................ *passim*

*United States v. Bassford*,
812 F.2d 16 (1st Cir. 1987) ..........................................................15

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980) ........................................................37

*United States v. Cianci*,
378 F.3d 71 (1st Cir. 2004) ..........................................................39

*United States v. Condron*,
98 F.4th 1 (1st Cir. 2024) ............................................................34

*United States v. Espinoza-Roque*,
26 F.4th 32 (1st Cir. 2022) ..........................................................14

*United States v. Jones*,
399 F.3d 640 (6th Cir. 2005) ........................................................12

*United States v. Katana*,
93 F.4th 521 (1st Cir. 2024) ............................................. 29, 33-36

*United States v. Lange*,
312 F.3d 263 (7th Cir. 2002) ............................................... 31-32

*United States v. Lewis*,
517 F.3d 20 (1st Cir. 2008) ................................... 11, 13, 20

*United States v. Lieber*,
No. 20-cr-10111 (D. Mass. Sept. 1, 2022) ..................................26

*United States v. Magana*,
127 F.3d 1 (1st Cir. 1997) ............................................................16

*United States v. Martin,*
   228 F.3d 1 (1st Cir. 2000) ............................................................. 48-49

*United States v. Mayendía-Blanco,*
   905 F.3d 26 (1st Cir. 2018) .................................................. 20, 34, 39

*United States v. Nosal,*
   844 F.3d 1024 (9th Cir. 2016) .................................................. 46

*United States v. O'Rourke,*
   417 F. Supp. 3d 996 (N.D. Ill. 2019) ..................................... 48

*United States v. Pacheco-Martinez,*
   791 F.3d 171 (1st Cir. 2015) .................................................... 33

*United States v. Penagaricano-Soler,*
   911 F.2d 833 (1st Cir. 1990) ............................................. 13, 18

*United States v. Powell,*
   469 U.S. 57 (1984) ............................................................... 39-41

*United States v. Rodríguez-Milián,*
   820 F.3d 26 (1st Cir. 2016) ..................................................... 29

*United States v. Sasso,*
   695 F.3d 25 (1st Cir. 2012) ..................................................... 30

*United States v. Simon,*
   12 F.4th 1 (1st Cir. 2021) ....................................................... 34

*United States v. Wen Chyu Liu,*
   716 F.3d 159 (5th Cir. 2013) .................................................. 31

*United States v. Wright,*
   582 F.3d 199 (1st Cir. 2009) ........................................... 22, 25

*United States v. You,*
   74 F.4th 378 (6th Cir. 2023) ................................................... 47

*Wayte v. United States,*
   470 U.S. 598 (1985) .................................................... *passim*

*Weins v. Sporleder*,
  569 N.W.2d 16 (S.D. 1997)...................................................................32

*Willhauck v. Halpin*,
  953 F.2d 689 (1st Cir. 1991) ...............................................................27

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ...................................................................... 13-14

## <u>STATUTES</u>

18 U.S.C. § 1343.......................................................................................7

18 U.S.C. § 1425(a)...................................................................................7

18 U.S.C. § 1546.......................................................................................7

18 U.S.C. § 1831.....................................................................................48

18 U.S.C. § 1831(a).................................................................................17

18 U.S.C. § 1832..................................................................................9, 48

18 U.S.C. § 1832(a)(3)..................................................................... 7, 30, 34

18 U.S.C. § 1832(a)(4)...............................................................................7

18 U.S.C. § 1836(b).................................................................................32

18 U.S.C. § 1839(3).......................................................................... 31-32, 43

18 U.S.C. § 1839(3)(B)............................................................................31

18 U.S.C. § 1839(5)(B)(iii)......................................................................47

18 U.S.C. § 1839(6).................................................................................31

18 U.S.C. § 3231.......................................................................................1

28 U.S.C. § 1291.......................................................................................1

42 U.S.C. § 1981.....................................................................................14

50 U.S.C. § 1705.......................................................................................7

# OTHER AUTHORITIES

C. Jolls & C.R. Sunstein, *The Law of Implicit Bias*,
94 Cal. L. Rev. 969 (2006) .................................................................27

Merriam-Webster.com Dictionary, *Implicit Bias*,
https://www.merriam-webster.com/dictionary/implicit%20bias
(last accessed Feb. 25, 2025) ............................................................27

Ministry of Education, People's Republic of China,
Subordinate Universities, http://en.moe.gov.cn/subordinate_universities/
(last accessed Feb. 24, 2025) ............................................................24

G. Rubinstein, *Selective Prosecution, Selective Enforcement, and Remedial
Vagueness*, Wisc. L. Rev. 825 (2022) ......................................... 13-14

## STATEMENT OF JURISDICTION

The district court (Young, J.) had subject matter jurisdiction because the indictment charged the defendant, Haoyang Yu ("Yu"), with an offense against the United States. 18 U.S.C. § 3231. The Judgment in a Criminal Case was docketed on July 13, 2023, and the defendant filed a timely notice of appeal the same day. [D.396, D.399].[1] This Court has jurisdiction over the defendant's appeal from his conviction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. The district court did not err in denying Yu's motion to dismiss the indictment based on selective prosecution or enforcement.

2. The wording of Count One does not require reversal, and the evidence was sufficient to prove the offense.

---

[1] Citations are as follows: "[D._]" refers to the district court docket; "[Br._]" refers to Yu's opening brief and "[Add._]" to the addendum thereto; "[JA._]" refers to the Joint Appendix; and "[JSA._]" refers to the Joint Sealed Appendix.

## STATEMENT OF THE CASE

### A.      Offense Facts[2]

Analog Devices, Inc. ("ADI") is a microchip design company based in Boston, Massachusetts.  [JA.1092].  Microchips process and store information and are a part of nearly all modern electronic devices.  [JA.1107].

Radio frequency or microwave amplifier microchips (often referred to as "monolithic microwave integrated circuits" or "MMICs") allow electronic devices to broadcast and send signals through the air and are critical in the aerospace and defense industries, including in radar applications.  [JA.1111-13, 1611, 1672, 2404-09].  A MMIC is just one to three millimeters in size and consists of many tiny components measured in microns or nanometers.  [JA.1105-07, 1126, 1584, 1949].

In July 2014, ADI acquired Hittite Microwave Corporation ("Hittite" or "HMC"), including Hittite's MMIC product line, for $2.5 billion dollars.  [JA.1110-11].  Yu, who had been working for Hittite, thus became a microchip design engineer at ADI.  [JA.1110-11].  ADI did not manufacture its own MMICs but instead worked with a manufacturing partner, or "foundry," in Taiwan called Win Semiconductors ("Win") to fabricate the chips.  [JA.1114-15].

---

[2] Yu asserts that his brief "summarizes the facts . . . in the light most favorable to the verdict."  [Br.16 n.8].  As the offense facts stated herein should make clear, that assertion is false.

Designing a MMIC is a multi-step process. [JA.1136, 2044, 2176-77]. After developing specifications for how the chip should perform, the company chooses a foundry to manufacture the chip. [JA.1121-23, 2662]. This decision must be made upfront because chip designs are foundry-specific, with each foundry having "process design kits" of components that the foundry is physically capable of making. [JA.1114, 1117-18, 1124, 1573-74, 1686, 2413].

Once those decisions are made, the chip designer moves into a conceptual design phase that generally takes weeks, if not months. [JA.2175-76]. To begin, the designer must create a functional "schematic," which consists of mathematical formulas and information for how the designer thinks various components could work together to produce the desired performance. [JA.1124-33, 1649, 2413, 2662]. The designer then creates a "layout," which is a diagram of the physical chip that specifies the size and precise placement of each component for each layer of the chip (MMICs typically have between 12 to 29 layers). [JA.1105-07, 1126, 1133-34, 1584, 1862, 1949, 2413]. Designers can customize foundry components by size, shape, and other values, and can also create features not in the foundry's process design kit. [JA.1223, 1648-49, 2674-75].

Creating the layout involves an "iterative" process of going back and refining the schematic and then re-adjusting the layout. When the designer finally has a layout he believes will work, the layout is converted into a GDS file (a data file that

3

contains all the design information required to manufacture the chip) to be sent to the foundry.  [JA.1135-37, 1148, 1583, 2175-76, 2413, 2662-63].  Sending the GDS file to the foundry is called a "tapeout" because it was historically done on a big tape.  [JA.1138].  The foundry manufactures the chips and sends them back, and the company tests them to see if they work as expected.  [JA.2413-14].  If the physical chip does not meet the specified goals, the design must go back through the schematic-layout-tapeout cycle again until it does.  [JA.1139-43, 2178-79, 2413-14, 2445, 2663-64].  MMICs are complex chips that often require multiple tapeouts to get right.  [JA.1160-61, 2083, 2664-68, 2676, 2865-66, 3202].

For business reasons, after the acquisition, ADI decided to transfer the manufacturing of certain Hittite MMICs from their original foundry (TriQuint) to Win.  [JA.1921].  Because chip designs are foundry-specific, switching foundries involves the difficult process of "translation," which involves designing a chip that can be manufactured by the new foundry that matches the specifications and performance of the original chip.  [JA.1118-19, 1147, 1921-22, 2721].  Translating a design is almost like "starting from scratch," and, in fact, translations can be the most time-consuming designs.  [JA.1118, 1143-47, 2621, 3202].  ADI named these translated chips by their legacy Hittite HMC number with an appended "A." [JA.1119-20].

4

In late 2016, Yu began copying ADI's MMIC designs and other proprietary information from ADI's computers to his personal cloud account and home computer. To hide what he was doing, Yu renamed some files after Pokémon characters and renamed K8600_TOP.gds, a GDS file from an ADI tapeout, to Kids8600.jpg to make it appear to be a photograph of his children. [JA.1150, 1807-09, 1819-25, 1866-90, 1925-26, 3935-38]. K8600_TOP.gds contained the designs for multiple ADI chips, including the prototype HMC1022A (*i.e.*, ADI's translation of the legacy Hittite HMC1022). [JA.3947, 3952].

In January 2017, while he was still employed at ADI, Yu contacted Win to set up his own account and began marketing his own, competing microchip design firm, Tricon MMIC. [JA.1266-72, 1391-93, 1654-61, 3694-95]. Yu formally incorporated "Tricon MMIC, LLC" under his wife's name on March 15, 2017. [JA.3508-09]. In emails to Win representatives, Yu acknowledged the high "barrier to entry" in the MMIC market but explained that "[w]e are starting up a company [] because we have some intellectual property that others cannot offer and we have a good confidence on our designs." [JA.3742].

On June 1, 2017—within just two days of Win granting Yu access to the relevant process design kit and Yu responding that Tricon would now "start our layout"—Yu transmitted his first batch of purported Tricon designs (which included copies of ADI's HMC907A, HMC797A, HMC462, and HMC465) to Win for

manufacturing with the note: "Please treat it as proprietary data." [JA.1390-91, 1676-97, 2464-65, 2492-97, 2505-06, 2516-19, 3746, 3789-97].

Several weeks later, Yu received back thousands of manufactured chips from Win. [JA.1587-89, 1694-95]. Win representatives noted that, unlike what they were used to seeing when receiving a new design for the first time, the Tricon chips were not manufactured as prototypes but rather a "finished good," as if Yu knew the chips would work on the first tapeout. [JA.1591-92].

While Win was fabricating the chips, Yu was busy communicating with business contacts and potential customers. [JA.2345-46, 3989-91]. On June 12, 2017, Yu messaged a friend and business contact that he had started his own business, but to "keep this a secret for now" because "I don't want to be noticed by the previous company." [JA.3997]. On July 10, 2017, he told a potential customer in China that he could send samples of the Tricon chips but only "after August 1st." [JA.3990].

Yu resigned from ADI on July 31, 2017. [JA.1477]. He began shipping samples and orders of Tricon chips to customers within a few days. [*E.g.*, JA.2344-48, 3518-3708, 3967-74, 3987].

On July 23, 2018, Yu sent Win a second GDS file that contained designs for multiple additional chips, including two that Yu named TM5051 and TM5052. The designs for TM5051 and TM5052 were based on the HMC1022A prototype design

in the K8600_TOP.gds file, which Yu had stolen from ADI two years earlier. [JA.1893-95, 1974-79, 2003-05, 2488-89, 2509-22, 3945-47].

On September 5, 2018, Yu received hundreds of finished TM5051 and TM5052 chips from Win. [JA.1652, 3798]. He advertised these chips on the Tricon website as the equivalent of the "ADI (Hittite) HMC1022 with more bandwidth." [JA.3727].

ADI's own HMC1022A chip was released for sale on February 15, 2019. [JA.3202]. The HMC1022A is designed for "military, space, and test equipment applications" and is controlled for export. [JA.1180, 3204].

## B. Procedural Overview

On January 26, 2022, a federal grand jury issued a Third Superseding Indictment that charged Yu with possessing stolen trade secrets, in violation of 18 U.S.C. § 1832(a)(3) & (a)(4) (Counts One through Twelve); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Thirteen through Seventeen); illegal exports of controlled technology, in violation of 50 U.S.C. § 1705 (Counts Eighteen and Nineteen); and immigration fraud, in violation of 18 U.S.C. § 1546 and 18 U.S.C. § 1425(a) (Counts Twenty and Twenty-One).

Before trial, the district court dismissed Count Thirteen as time barred. [D.194]. The case was tried before a jury over fifteen days beginning May 3, 2022. At the close of the evidence, the court entered a judgment of acquittal on Count

Twenty-One and submitted the remaining counts to the jury. [D.259; JA.2998]. On May 26, 2022, the jury found Yu guilty on Count One, which concerned the HMC1022A, and acquitted him on all other counts.

On June 1, 2023, the district court sentenced Yu to six months of imprisonment with a self-report date of July 13, 2023. [D.374]. Yu moved for bail pending appeal. [D.373]. On June 22, 2023, after Yu threatened a trial witness at the supermarket and called him a "hanjian" (a Chinese language epithet that translates roughly as a "traitor to China"), the court denied bail pending appeal, revoked Yu's self-report date, and ordered him taken into custody. [D.392 at 3-4, 8-10, 13; *see* D.376 (under seal)]. Yu has since served his custodial sentence and is now on supervised release.

## SUMMARY OF ARGUMENT

The district court did not err in rejecting Yu's claims of selective prosecution and selective enforcement based on his ethnicity. To the extent Yu has not waived his selective prosecution claim, the court did not err in finding he failed to offer clear evidence that similarly situated people of different ethnicities were not prosecuted, as Supreme Court precedent requires. The court also did not clearly err in finding that, regarding the alleged selective enforcement, the investigatory record showed the agents would have taken the same steps regardless of Yu's ethnicity and that they were not motivated by a discriminatory purpose.

Yu's other claims are likewise meritless.  His challenge to the wording of Count One is not a claim of insufficiency or constructive amendment; he has waived any variance claim; and, in any event, he cannot show a prejudicial variance.

The testimony of multiple witnesses was more than sufficient to show that the Count One trade secret was not readily ascertainable from any publicly available product and that the ADI HMC1022A prototype design Yu possessed derived independent economic value from being kept secret.

Section 1832 does not require the government to prove the defendant *knew* the trade secret was a trade secret, but there was nevertheless ample evidence from which a rational jury could have inferred Yu's knowledge.

## ARGUMENT

### I.  THE DISTRICT COURT DID NOT ERR IN DENYING YU'S MOTION TO DISMISS THE INDICTMENT BASED ON SELECTIVE PROSECUTION OR ENFORCEMENT

Yu contends the district court erred in refusing to grant his motion to dismiss the indictment due to selective enforcement and prosecution. [Br.41-70].  The court did not err in finding Yu failed to prove his claims.

### A.  Procedural History

On June 22, 2020, Yu moved to dismiss the indictment on the grounds of selective prosecution and selective enforcement "based on his Chinese ethnicity," and the government opposed.  [JA.122-616].  At a motion hearing on October 9,

2020, the district court said it would take the issue under advisement pending trial. [JA.922-42; Add.16-21].

The court revisited the motion after the verdict in an order dated June 13, 2022. [Add.22-26]. The court denied discovery on Yu's selective prosecution claim (and denied the claim) on the ground that "[s]ufficiently clear evidence that similarly situated individuals of a different race were not prosecuted is simply not present here," which was a reference to the "clear evidence" standard the Supreme Court set forth for such claims in *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996). [Add.25].[3] However, the court also found, over the government's objection, that the *Armstrong* standard did not apply to Yu's selective enforcement claim, and that on that basis, "some limited discovery m[ight] be appropriate" on that separate claim. [Add.25 (agreeing with Yu that selective enforcement "may be established by a fair preponderance of the evidence"); JA.849].

The government accordingly provided discovery on Yu's selective enforcement claim. [JA.827-98].[4] At a hearing on May 11, 2023, after reviewing the parties' supplemental memoranda, the court denied Yu's claim, reasoning as follows:

---

[3] Yu later requested reconsideration, but the court declined to reconsider this ruling. [JA.766-89, 808-11; D.318; Add.60-61].

[4] On November 28, 2022, before discovery was complete, the court entered a minute order denying Yu's selective-enforcement claim, which the court later explained was a mistake. [D.324; Add.60].

I do find, by a fair preponderance of the facts, that given the tip or tips that the law enforcement folks got about the conduct of Mr. Yu and his company, what were they to do? It seems – it's all very well to say these tips were "lame," but had they not devoted their resources to investigating them and had events proved that these dual-use, um, items, these MMICs, which ha[d] a military or a potential military use . . . we, those not in law enforcement, would be second-guessing the law enforcement officers about how they should have done more and why didn't they take more aggressive action? And it was not for this Court to second-guess those officers in this respect in responding to what rationally was perceived as a potential threat with respect to a foreign nation.

At the same time I would be blind . . . to say that there was not implicit bias here. It made a difference that this American citizen was born in Mainland China, went to this university that at least the FBI characterizes as it does, um, apparently has relatives, people to whom he might well visit in his country of origin . . . I conclude that certainly did not help him and, um, it played a role in part in what happened here. Having said that, I likewise conclude that they would have started an investigation in any event had it been John Smith Caucasian who had these same ties. That is this Court's finding.
. . .
So at each critical stage here, I do not deny that there was implicit – not explicit discrimination against Mr. Yu, but implicit bias based upon his ethnic heritage. There was. Nevertheless, because this Court concludes, by a fair preponderance of the evidence, that the steps that are crucial here, deciding to commit law enforcement resources to investigation, and further to later involve the Officers of the United States Attorney, because those would have happened, I find, in any event based upon the undisputed record I have before me, the motion is denied.

[Add.51-54].

## B. <u>Standard of Review</u>

The Court reviews the denial of discovery on a selective prosecution claim for abuse of discretion, *United States v. Lewis*, 517 F.3d 20, 24 (1st Cir. 2008), but it

has not stated the standard of review for the disposition of either a selective prosecution or a selective enforcement claim. Citing two out-of-circuit cases, Yu argues for de novo review [Br.41 & n.11], though at least one other circuit has applied abuse-of-discretion review.[5] *See United States v. Jones*, 399 F.3d 640, 644 (6th Cir. 2005).

The Court need not decide between these standards to decide this appeal as the parties agree that any *findings of fact* are reviewable only for clear error [Br.41], and the district court made factual findings that dispose of both of Yu's claims.

### C.    The Court Did Not Err in Denying Yu's Selective Prosecution Claim[6]

To establish selective prosecution in violation of the Equal Protection Clause, a defendant must show "the decision to prosecute" was "deliberately based upon an unjustifiable standard such as race" or ethnicity, or "other arbitrary classification." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up); *see Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021) ("Selective prosecution occurs when, from among the pool of people referred by police, a prosecutor pursues similar cases

---

[5]    Yu has chosen not to appeal the district court's denial of discovery on his selective prosecution claim and argues only that the claim should have been granted on the existing record.  [Br.41 n.11].

[6]    Yu's brief consistently conflates his selective prosecution and enforcement claims.  Because the district court resolved these claims on different standards (at Yu's request [Add.38; JA.829]), and they pertain to different decisions by distinct governmental actors, the government addresses them separately herein.

differently based on race."). This requires showing both (1) discriminatory effect (*i.e.*, that "similarly situated individuals of a different race were not prosecuted"), and (2) discriminatory intent (*i.e.*, that the effect was "motivated by a discriminatory purpose"). *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

Resource constraints mean prosecutors must exercise discretion in choosing which cases to pursue. *See United States v. Penagaricano-Soler*, 911 F.2d 833, 837 (1st Cir. 1990) ("[T]he impartial administration of the criminal laws must be managed with limited law enforcement resources, which entails the exercise of commensurate prosecutorial discretion in targeting criminal prosecutions." (citations omitted)). Because this determination is "one of the core powers of the Executive Branch" (and "particularly ill-suited to judicial review," *Wayte*, 470 U.S. at 607), courts apply a "presumption of regularity" to the government's prosecutorial decisions. *Armstrong*, 517 U.S. at 464, 467. To displace this "formidable" presumption," a defendant claiming selective prosecution must adduce "clear evidence" of both prongs of the equal protection test. *Lewis*, 517 F.3d at 25.

Perhaps unsurprisingly given the "demanding" nature of this standard, *Armstrong*, 517 U.S. at 463, Yu has identified no successful claim of selective prosecution based on race or ethnicity since the Supreme Court's 1886 decision in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), and certainly none since *Armstrong*. *See* G. Rubinstein, *Selective Prosecution, Selective Enforcement, and Remedial*

*Vagueness*, Wisc. L. Rev. 825, 829 & n.16 (2022) ("[T]he last successful selective prosecution claim at either the state or federal level was the very first one that reached the Court back in 1886—*Yick Wo*[.]").  Yu's claim is no better than the many failed claims that preceded it.

The district court found that Yu did not come close to offering "[s]ufficiently clear evidence that similarly situated individuals of a different race were not prosecuted," and that finding was sound.  [Add.25].  Yu's brief not only fails to undermine this conclusion but somehow fails to even acknowledge *Armstrong*'s "clear evidence" standard, of which Yu is fully aware.  [JA.766, 928].  Just as it is waiver for an appellant to fail to address the plain-error standard where it applies, *see United States v. Espinoza-Roque*, 26 F.4th 32, 36 (1st Cir. 2022), so too should the Court deem it waiver for an appellant to completely ignore the substantive standard that controls his claim as Yu has done.  *See Alston v. Int'l Ass'n of Firefighters, Loc. 950*, 998 F.3d 11, 25 (1st Cir. 2021) (finding appellant's claim under 42 U.S.C. § 1981 waived where "[i]n his appellate briefing, he [did not] delineate[] the applicable legal standard for such claims nor ma[de] the slightest effort to apply section 1981 to the facts of record").

Even if the Court declines to find waiver, Yu's claim plainly lacks merit.  Yu proffered no evidence of "similarly situated offenders of other races . . . known to federal law enforcement officers" whom the U.S. Attorney declined to prosecute.

14

*Armstrong*, 517 U.S. at 470; *see United States v. Bassford*, 812 F.2d 16, 20 (1st Cir. 1987) (rejecting claim where evidence showed the "[U.S.] Attorney accepted all cases referred to his office [from the state] if he considered that a prima facie violation had been shown" and thus defendant "failed to allege facts suggesting that the federal prosecutor ha[d] declined to proceed against others similarly situated").

There is no evidence (let alone "clear evidence") that the former ADI employees involved in the *Macom* lawsuit Yu cites were similarly situated to him. [Br.47; JA.129-30]. The complaint in that case indicated the former employees "attempt[ed]" to take trade secret materials from ADI but were "caught," so ADI was alleging only "on information and belief" that "confidential [ADI] trade secrets nonetheless made their way to MACOM." [JA.469]. Yu has offered no information that indicates there was *evidence* to back up ADI's allegation, and the fact that ADI voluntarily dismissed the case shortly after filing suggests otherwise. *See* ECF 40, *Analog Devices, Inc. v. Macom Tech. Solutions Holdings, Inc.*, No. 18-cv-11028 (D. Mass. July 16, 2018). By contrast, ADI did not catch Yu in the act of stealing ADI's trade secrets, there was strong evidence he successfully converted and was profiting from those secrets, and there was also evidence of illegal exports.

Yu complains that, unlike Tricon, the government never prosecuted ADI or Custom MMIC for *their* purported unlawful, unlicensed exports of GDS design files. [Br.47]. Nothing in the record supports Yu's assertion that ADI ever made such

exports; Yu just cites his own made-up allegations, which are not evidence. And Custom MMIC was not similarly situated to Yu and Tricon because, among other things, Custom MMIC's exported GDS files did not contain stolen trade secrets.

The other Massachusetts civil trade secrets cases Yu identifies also do not support his contention that he was unfairly "singled out" for criminal prosecution. [Br.47; JA.147-49]. There is no indication the government even *knew* about those defendants, much less evaluated their conduct; further, there is no evidence those defendants actually engaged in conduct comparable to Yu's. [JA.602-03 (noting that the government would have "no reason to know of the existence of these cases . . . unless [it] happen[ed] to be investigating the same case or [] received an independent report")]. *See Armstrong*, 517 U.S. at 469 ("'Selective prosecution' implies that a selection has taken place." (cleaned up)).

Finally, Yu's reliance on cases of other people of his ethnicity who *were* prosecuted for trade secrets–related offenses is misplaced. [Br.46, 67-68; *see* JA.131-32]. The district court could not grant relief based on that information because this Court has said that evidence that other people of the same ethnicity *were* prosecuted is not evidence that similarly situated defendants of other ethnicities *were not* prosecuted, which is the showing *Armstrong* requires. *See United States v. Magana*, 127 F.3d 1, 8 (1st Cir. 1997) (affirming district court's rejection of discovery regarding selective prosecution because defendants did not "make a

threshold showing that there were similarly situated [non-Spanish-speaking] persons who were not prosecuted" but showed only that "Spanish-speaking persons were being prosecuted").

The district court never reached the discriminatory purpose prong of Yu's selective prosecution claim, and this Court need not either. It bears noting, though, that Yu offered no evidence the prosecutors chose to pursue his case due to "racial bias." [Br.50, 69]. Though Yu acknowledged below that his case was not part of the Department of Justice "China Initiative" [Add.36-37], he nevertheless bases most of his discriminatory-intent argument on statements by officials about that initiative. [Br.48-49]. In any event, those statements do not express an intent to discriminate based on ethnicity. They express concern about the threat of economic espionage by the Chinese government[7] and an intent to focus law enforcement resources on the cases more likely to raise that threat, such as cases where the defendant has "China ties." [Br.49: JA.135-39]. The fact that then-U.S. Attorney Andrew Lelling acknowledged that an "unfortunate[]" collateral effect of this focus would be a disparate impact on the ethnically Chinese population (as the people most likely to have ties to China) [Br.49] does not transform these legitimate policy concerns into a "discriminatory purpose" under the Equal Protection Clause. On the

---

[7] Economic espionage refers to the theft or misappropriation of a trade secret with the intent to "benefit any foreign government, foreign instrumentality, or foreign agent." 18 U.S.C. § 1831(a).

contrary, the Supreme Court has emphasized that adopting a policy with mere "awareness" of a likely disparate impact is not what is meant by that term; rather, to establish a "discriminatory purpose," the defendant must show that the disparate impact was at least part of the *reason for* the policy, *i.e.*, that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon [the] identifiable group." *Wayte*, 470 U.S. at 610 (cleaned up). Yu offered no evidence to that effect with respect to either the China Initiative or this prosecution. *Cf. Penagaricano-Soler*, 911 F.2d at 838 (rejecting selective prosecution claim because even though defendant cited "public statements by several high-ranking officials . . . that 'Operation Greenback' was intended to put mainland bankers on notice," "the government presented sufficient countervailing reasons of a non-discriminatory nature" for making "Puerto Rico [banks] . . . a focal point of the investigation" and then "simple demographics ordained that Puerto Rico bankers of Hispanic descent would be snared as well").

The various other prosecutorial acts Yu cites are also irrelevant. A juror challenge sheds no light on why the government decided to prosecute the case,[8] and

---

[8] Yu's claim of why it was "particularly troubling" that the aborted strike concerned an Asian-American juror named "Jimmy" misstates the record. First, there is no evidence the juror had any legal first name *other* than "Jimmy." Second, the government never argued that Yu's use of the name "Jack" in his Tricon dealings was suspicious because an Asian person using an anglicized name is suspicious; the

neither does a press release's inclusion of "irrelevant facts" about Yu's background. [Br.62-64, 66-67]. The fact that the press release included the superfluous fact that Yu was a "Lexington man," for example, does not prove that the government chose to prosecute him because he lived in Lexington. [Br.63].

### D. The Court Did Not Err in Denying Yu's Selective Enforcement Claim

Selective enforcement "occurs when police investigate people of one race but not similarly-situated people of a different race." *Conley*, 5 F.4th at 789 (cleaned up). As a claim that arises under the Equal Protection Clause, selective enforcement also requires a two-part showing—specifically, that the investigators' challenged decisions (here, to open the investigation and then to refer the case to prosecutors [Add.33]) (1) "had a discriminatory effect," and (2) were "motivated by a discriminatory purpose." *Wayte*, 470 U.S. at 608; *see United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (noting that the two prongs of a selective enforcement claim mirror those of a selective prosecution claim).

The government argued below that *Armstrong*'s "clear evidence" standard applies to selective enforcement claims, but the district court disagreed. [Add.25]. The Court need not resolve this question to decide this appeal because the district

---

government argued it was suspicious because Yu had never used the name "Jack" at ADI, and using a different name was just one of multiple actions he took to hide Tricon from his former employer. [*E.g.*, JA.1076-77, 1110, 1265-66, 1665-68, 2035-36, 2167-68, 2257, 2675, 3997].

court correctly found that Yu did not establish either discriminatory effect or discriminatory purpose even under the lower preponderance-of-the-evidence standard.

## 1. *No Discriminatory Effect*

Yu failed to establish a discriminatory effect due to alleged selective enforcement through statistics for much the same reason he failed to do so for his selective prosecution claim: he did not identify any similarly situated trade secret thieves of a different ethnicity that the agents knew about and declined to investigate. *See supra* pp. 14-17. Because the district court granted discovery on this claim, though, Yu also had an opportunity to make a case-specific showing of discriminatory effect, *i.e.*, to show that the agents would not have taken the challenged actions in this case if not for Yu's ethnicity. After reviewing the investigatory record, however, the court reached the exact opposite conclusion—namely, that the agents would have taken the challenged actions even if Yu had been "John Smith Caucasian." [Add.53].[9]

---

[9] The district court's reasoning here limited the pool of "similarly situated" people to those with "the[] same [non-ethnicity] ties" to China that Yu had. [Add.53]. This limitation was appropriate for the reasons stated below, *see infra* pp. 25-26, but in any case, Yu's choice not to argue that the court "framed the contours of the pool of similarly situated offenses too narrowly," *Lewis*, 517 F.3d at 26, means he has waived any such claim. *See United States v. Mayendía-Blanco*, 905 F.3d 26, 32 (1st Cir. 2018) ("[A]rguments not raised by a party in its opening brief are waived.").

Yu tries to skirt the import of this finding in several ways, but none are persuasive.

First, contrary to Yu's suggestion, this finding *was* "legally []relevant" because it was a finding of no discriminatory effect. [Br.70].

Second, Yu incorrectly portrays the court's statement that his connections to China "played a role in part in what happened here" as the equivalent of a finding of discriminatory effect. [Br.68-69 (citing Add.52)]. Not so. To the extent the court was saying Yu's *ethnicity* "played a role" in what occurred (as opposed to his *non-ethnicity* ties to China, which the government agreed "played a role" but cannot form the basis of a valid equal protection claim, *see infra* pp. 25-26), the court was plainly speaking only in terms of actual causation and not the but-for causation required to prove discriminatory effect. [Add.31, 33-34 (opinion that if "this enforcement [would] have happened anyway" even if Yu were of a different ethnicity, then there would be no problem even if "in the facts of this case, his heritage was taken into account"). *Cf. Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 657 (2020) (distinguishing actual causation from but-for causation in the Title VII context).[10] That is why the court immediately followed this statement with the express finding of no discriminatory effect cited above. [Add.53].

---

[10] Absent but-for causation, the effect would be *even-handed enforcement* by race and ethnicity, which obviously cannot be improper "selective enforcement."

Third, though Yu quotes the "because of and not merely in spite of" language of *Wayte* to imply that actual causation is enough to show discriminatory effect [Br.69], he is misusing *Wayte*. The "because of" language in *Wayte* had nothing to do with discriminatory effect; instead, it concerned what is required to show that a discriminatory effect (if one exists) was motivated by a "*discriminatory purpose*." 470 U.S. at 610 (emphasis added). *See supra* p. 18. *Wayte* thus cannot help Yu because the court found he did not establish any discriminatory effect.

Fourth, Yu separately argues the court's no-causation finding was "unsupported by the evidence" [Br.70], but he has not even come close to showing clear error. *See United States v. Wright*, 582 F.3d 199, 208 (1st Cir. 2009) ("[W]hen two or more legitimate interpretations of the evidence exist, the factfinder's choice between them cannot be deemed clearly erroneous." (cleaned up)). There is no dispute the investigation was triggered by two, independent industry tips to law enforcement about potential trade secret thefts that might involve export-controlled technology by a new company called "Tricon." [JA.546-47, 549-51, 845-48; JSA.79-81, 92-96]. The agents soon determined that Yu was probably the person behind Tricon, he had previously worked at ADI, and Tricon chip TM5054 was a power amplifier that could be used in radar and other military applications that, according to the Commerce Department, was export controlled. [JA.861-63; JSA.93-94]. Initial inquiries also revealed that Yu had a "strong nexus" to China:

he had been educated at Tsinghua University (an institution that supports Chinese military programs though "radar-related research" and other research and that had previously tried to obtain sensitive technologies from the U.S.); he visited China frequently (including just before resigning from ADI); and he was married to a Chinese national who was also Tricon's owner of public record and thus potentially involved. [JA.847-48; JSA.93-97]. Agents then found "TRICON parts . . . being advertised for sale by Chinese companies on websites in the People's Republic of China" (with some of those companies claiming to be Tricon "sales representatives") and learned that ADI had suspicions about trade-secret thefts by Yu consistent with the tips. [JA.423; JSA.95]. The district court quite reasonably concluded that this confluence of factors would have led to an economic espionage investigation regarding China of a person of *any* ethnicity.

Yu responds, *inter alia*, that (a) the industry tips were "vacuous" [Br.2, 52-53]; (b) the agents should not have relied on the Commerce Department's (later-reversed) classification of the TM5054 [Br.51 n.14]; (c) the agents unfairly viewed "innocuous" facts like using a spouse's name on incorporation documents as "suspicious" when Yu did them but not when Paul Blount did [Br.47]; (d) Tsinghua University is no more tied to the Chinese government than Harvard or MIT are to the U.S. government [Br.57-58]; (e) the agents with "due diligence" could have found out he had elderly parents in China [Br.57 n.16]; and (f) the investigation

ultimately did not bear out the agents' concern that Yu was stealing trade secrets for the Chinese government.  [Br.62, 70].  None of these points move the needle.

As the district court observed, regardless of Yu's post-hoc assessment of the "tips," it was reasonable for the agents to pursue them rather than *ignoring* them given the risks involved.  [Add.52].  It was also reasonable for the agents to rely on the Commerce Department's classification of TM5054 (and there was no indication the licensing officer knew Yu's ethnicity).  [JA.520].  Yu cannot be compared to Blount because the agents (appropriately) considered Yu's actions within the totality of the circumstances, and there was no indication *Blount* had stolen trade secrets and was trying to hide his new business from his former employer.  Visiting relatives in China does not preclude someone from *also* engaging in business on the same trip (and indeed, the investigation revealed that is exactly what Yu did on his July 2017 trip to China [JA.3989-90]).  As for Tsinghua University, the relationship between an authoritarian government and a university under its Ministry of Education[11] is not the equivalent of the relationship between the U.S. government and a private U.S. university.  Furthermore, the agents observed a potential connection specifically between Tsinghua University's radar-related research for the Chinese military and the TM5054 chip that was designed for such applications.  Finally, the fact that the

---

[11]    *See* Ministry of Education, People's Republic of China, Subordinate Universities, http://en.moe.gov.cn/subordinate_universities/ (last accessed Feb. 24, 2025).

agents ultimately did not find evidence to support an economic espionage charge can hardly cast doubt on their decision to *investigate* the matter where determining whether there was such evidence *was the purpose of the investigation.*[12] *See Wright*, 582 F.3d at 205, 213 (noting that reasonable suspicion to investigate can exist even if the agent has not "rule[d] out the possibility of innocent" explanations because the very purpose of an investigation can be "to clarify [such] ambiguous situations").

## 2. *No Discriminatory Purpose*

The court also found, correctly, that Yu failed to prove the agents' challenged decisions were motivated by a "discriminatory purpose."

First, to be clear, the government has never disputed that the agents who initiated the investigation were concerned about economic espionage by China and thus were motivated by the risk raised by the combination of alleged trade secret thefts of sensitive technology and "Yu['s] . . . strong nexus to the People's Republic of China." [Add.44; JSA.93]. That is not a "discriminatory purpose." Having ties

---

[12]  Although the investigation did not show that Yu stole trade secrets for anyone's benefit other than his own, it did reveal that he not only had business contacts in China but was in fact actively seeking to do business there. [*E.g.*, JA.3645 ("I don't have an agent in Korea yet, China only."), 3988 (discussing potential business partnership with a Chinese firm), 3996 ("Sun, are you still in [Nanjing]? [H]elp me promote www.triconmmic.com when you have time. See if they want microwave wideband amplifier chips . . . already have some customers in the U.S., trying to see if I can expand to China"), 3999 ("[Yin Zhe:] China is investing heavily in the GaN field these days."), 4000-01 ("[Sun Zhichao:] @haoyang this is of national interest. Hurry up, return to China and start a business. [Yu:] Yes, when I am ready, I will definitely return to serve the country.")].

to China (*e.g.*, being educated there, visiting frequently, being married to a Chinese national) is not the same thing as being of Han Chinese *ethnicity*,[13] and having ties to China is not a suspect classification under the Equal Protection Clause. Moreover, when it comes to concerns about economic espionage for the benefit of China, focusing on people with ties to China is rational and not "arbitrary," *Wayte*, 470 U.S. at 608. Having ties to China increases the potential for a direct link to the Chinese government, and it also increases the potential for indirect links—such as, for example, having business contacts in China who are affiliated with state-owned entities or "ostensibly private companies" that work with the Chinese government. [JA.413].

Second, although the district court here found that there was—separate from the above-described explicit consideration of Yu's ties to China—some "implicit bias" (but no "explicit discrimination") "based on [Yu's] ethnic heritage," that was not a finding of discriminatory intent. [Add.54].[14] It was a finding of *no* discriminatory intent.

---

[13] A person can have ties to China without being Han Chinese and vice versa. One high-profile China Initiative case tried in this district, for example, involved a Caucasian defendant with significant personal and professional ties to China. *See* ECF 282, *United States v. Charles Lieber*, No. 20-cr-10111 (D. Mass. Sept. 1, 2022). [*Cf.* JA.183-84].

[14] This might explain, for example, why some agents mistakenly referred to Yu as a "Chinese national" even though he was naturalized in March 2017. [Br.59-61].

A discriminatory intent need not be express to raise equal protection concerns, but it *does* need to be "deliberate[]" and "purpose[ful]." *Wayte*, 470 U.S. at 608, 610 (noting that "discriminatory purpose" encompasses both an "awareness of consequences" *and* a choice); *McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004) ("[I]n equal protection cases, plaintiffs must show that the relevant government actor *intended to discriminate* against the disfavored group." (emphasis added)); *accord Willhauck v. Halpin*, 953 F.2d 689, 711-12 (1st Cir. 1991). The defining characteristic of "implicit bias," by contrast, is that it is not a conscious or purposeful choice. *See Implicit Bias*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/implicit%20bias (last accessed Feb. 25, 2025); C. Jolls & C.R. Sunstein, *The Law of Implicit Bias*, 94 Cal. L. Rev. 969 (2006). Implicit bias therefore cannot constitute a "discriminatory purpose" under the Equal Protection Clause. *See Naumovski v. Norris*, 934 F.3d 200, 216 n.50 (2d Cir. 2019) (observing that "[a] claim of discrimination based on unconscious bias is, by its nature, not 'purposeful or intentional' and therefore inadequate to state a claim" under the Equal Protection Clause and distinguishing such bias from "animus" and "conscious stereotyping"). The Equal Protection Clause is not aimed at the subconscious workings of the human mind.

Perhaps aware of this fatal flaw in his argument, Yu alternatively contends that the court clearly erred in finding there was no "explicit discrimination" because

(in Yu's words) the "choice by both agents and prosecutors to single out Mr. Yu because of a phantom 'nexus' to China was intentional, blatant, and persistent." [Br.69]. There was no clear error. Prioritizing a case due to a defendant's ties to China is not invidious discrimination, and Yu had actual ties to China, not imaginary ones. [Br.51, 54-55]. *See supra* pp. 25-26 & note 12. As noted above, the fact that these ties upon further investigation turned out not to extend to the Chinese government does not retroactively invalidate the investigation. *See supra* pp. 25-25. By the same token, the fact that the government did not find evidence of the feared economic espionage crime does not mean the government was thereby constitutionally required to decline enforcement of the federal crimes it did find. [Br.70].[15]

---

[15] As Yu has established no equal protection violation, the Court need not reach the question whether dismissal of the indictment would be the correct remedy for such a violation, which neither this Court nor the Supreme Court has decided. [Br.44-45]. *See Armstrong*, 517 U.S. at 461 n.2 ("We have never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of his race.").

## II. THE WORDING OF COUNT ONE DOES NOT REQUIRE REVERSAL, AND THE EVIDENCE WAS SUFFICIENT TO PROVE THE OFFENSE

Yu raises four claims under the heading of "sufficiency." [Br.26-41]. The Court should reject these claims.

### A. Procedural History

Yu moved for a judgment of acquittal after the government's case and at the close of the evidence. [JA.2980, 2985]. The court denied the motion except for Count Twenty-One. [JA.2998]. After the verdict, Yu filed a post-verdict motion for a judgment of acquittal on Count One, which the court denied on September 7, 2022. [D.307; JSA.40-43].

### B. Standard of Review

The Court reviews preserved claims of constructive amendment and prejudicial variance de novo. *United States v. Katana*, 93 F.4th 521, 530 (1st Cir. 2024).

Unpreserved variance claims are reviewed for plain error, which requires the defendant to show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Rodríguez-Milián*, 820 F.3d 26, 32-33 (1st Cir. 2016) (cleaned up).

The Court reviews preserved sufficiency claims de novo, "tak[ing] the facts and all reasonable inferences therefrom in the light most favorable to the jury verdict." *United States v. Sasso*, 695 F.3d 25, 27 (1st Cir. 2012).

## C.     **Statutory Framework**

Section 1832(a)(3) provides that "who[m]ever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly. . . receives, buys, or possesses such information, knowing the same to have been stolen or appropriated [] without authorization" shall be punished as stated therein.  18 U.S.C. § 1832(a)(3).

To prove a violation of § 1832(a)(3), the government must show: "(1) that the defendant intended to convert proprietary information to the economic benefit of anyone other than the owner; (2) that the proprietary information was a trade secret; (3) that the defendant knowingly stole, copied, or received trade secret information"—or, in this case, which charged "possess[ion]," that the defendant possessed such information knowing it was stolen or misappropriated—"(4) that the defendant intended or knew the offense would injure the owner of the trade secret; and (5) that the trade secret [related to a product . . . used in or intended for use] in

30

interstate commerce." *United States v. Wen Chyu Liu*, 716 F.3d 159, 169-70 (5th Cir. 2013).

With respect to the second element listed above, the statute defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and *not being readily ascertainable through proper means* by, another person who can obtain economic value from the disclosure or use of the information." § 1839(3) (emphasis added). Because "reverse engineering" a public product is considered a "proper means" of ascertaining information under the statute, *see* § 1839(6), for information to be "not . . . readily ascertainable through proper means" as required by the definition, the information must be "not . . . readily ascertainable" from the product through reverse engineering. *See United States v. Lange*, 312 F.3d 263, 268 (7th Cir. 2002).

Information is "readily ascertainable" through reverse engineering if it can be "easily discover[ed]" that way. *Id.* If, on the other hand, reverse engineering is possible but "would require a substantial investment of time, effort, and energy," then the information may be ascertainable through reverse engineering, but it is not *readily* ascertainable and thus still satisfies the § 1839(3)(B) definition. *AvidAir*

*Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 973 (8th Cir. 2011) (stating that "[t]he fact that information can be ultimately discerned by others [through] reverse engineering" does not defeat trade secret protection where such reverse engineering would require a great deal of time or cost)[16]; *see also Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 189-90 (1st Cir. 2023) (affirming district court's finding that information was a trade secret because, among other things, "to the extent [it] w[as] duplicable" from public sources, doing so "would have been immensely difficult"); *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 387 n.31 (3d Cir. 2021) (contrasting "situations in which reverse engineering is so straightforward that the distribution of a product is itself akin to a disclosure," which would defeat trade secret protection, with situations where "someone might—hypothetically and at unknown cost in time, effort, and money—figure out some means to discover [the information] through reverse engineering," which would not).[17]

---

[16] Because § 1839(3)'s definition of a "trade secret" applies also in federal civil proceedings, *see* § 1836(b), cases brought under that provision may be helpful in construing what constitutes a "trade secret" under § 1832. In addition, because Congress based the § 1839(3) definition on the language of the Uniform Trade Secrets Act ("USTA"), *see Lange*, 312 F.3d at 267, trade secrets cases from states that have adopted the UTSA can also be illuminating. [D.225 (Joint Memorandum on the Admissibility of Evidence Regarding Reverse Engineering)].

[17] *Compare, e.g.*, *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 899 (Minn. 1983) (information not readily ascertainable where "CMI could not *readily* (i.e. quickly) reverse engineer a motor with exactly the same dimensions, tolerances, and materials" as alleged trade secret), *with, e.g.*, *Weins v. Sporleder*, 569 N.W.2d 16, 21 (S.D. 1997) (recipe for cattle feed product not a trade secret because it could have been reverse engineered via lab testing that cost $27).

Yu does not challenge the sufficiency of the government's proof regarding his intent to convert, his knowledge that he possessed the information, his knowledge that the information was stolen or misappropriated, his intent to injure ADI, the interstate commerce nexus, or, within the definition of a "trade secret," that ADI took reasonable measures to keep the Count One information secret.

### D. Yu's Challenge Regarding the Wording of Count One Is Not a Claim of Insufficiency or Constructive Amendment, and Any Claim of Prejudicial Variance is Both Waived and Meritless

Count One in the Third Superseding Indictment charged Yu with "knowingly possess[ing] an ADI trade secret related to a product used in and intended for use in interstate and foreign commerce," to wit, "[t]he design layout and GDS file for the HMC1022A microchip." [JA.110]. Yu asserts that this language plainly alleges possession of specifically *the final design* for ADI's HMC1022A microchip and thus the government's proof that he possessed a prototype design for the HMC1022A was insufficient for conviction or else a constructive amendment. [Br.31].

Yu's argument that the government failed to prove he committed the crime in the manner purportedly described in the indictment should be a claim of variance. *See Katana*, 93 F.4th at 530 ("[A] variance occurs when the government relies at trial on different facts than those alleged in the indictment to prove the same offense."). It is not a claim that the evidence was insufficient to meet the statutory elements. *See United States v. Pacheco-Martinez*, 791 F.3d 171, 177 (1st Cir. 2015)

(deeming it a claim of variance rather than of insufficiency where defendant did not dispute the conduct proved at trial "fit[] the statute" but instead argued it "did not fit the language of the indictment").  It is also not a claim that the trial "alter[ed] any statutory element of the offense charged" and thereby turned it into a different offense, *United States v. Condron*, 98 F.4th 1, 25 (1st Cir. 2024), because Yu does not dispute that the government's Count One evidence trained solely on a violation of § 1832(a)(3), and that was "precisely the statutory offense charged in the indictment."  *Katana*, 93 F.4th at 530-32, 535-36 (explaining that it is a claim of variance to allege that the government proved a different "means of committing the same offense"); *accord United States v. Simon*, 12 F.4th 1, 34 (1st Cir. 2021) (no constructive amendment "[s]o long as the statutory violation remains the same").

Yu has therefore chosen to rely on the wrong doctrines while eschewing the right one, even though the government identified the correct doctrine for him below and he subsequently argued it there in the alternative.  [JA.715, 751-52].  Yu has thus deliberately waived any claim of variance, and the Court need go no further. *See Mayendía-Blanco*, 905 F.3d at 32 (claims not raised in appellant's opening brief are waived).

If, however, the Court chooses to consider this waived claim, it clearly fails, which is likely why Yu did not bother to make it.

The first step in assessing any variance claim is to read the indictment "in a plain and commonsense manner." *Katana*, 93 F.4th at 530. Doing so here makes clear that there was no variance. Yu's claim that the use of the definite article "*the*" necessarily limits the charge to "*the* design layout and GDS file for . . . the actual product that ADI sold in interstate commerce" [Br.30-31] ignores both how people naturally communicate in English and the rest of the indictment. The mere use of the word "the" in common parlance does not necessarily imply a "final" version rather than any other version of the same thing.[18] In fact, Yu himself lapses into using a nearly identical phrase in the very next section of his brief to mean the same thing the grand jury meant—*i.e.*, the HMC1022A prototype design he was alleged to have stolen. Specifically, Yu refers there to "*the* layout and GDS file for *the* HMC1022A" and states that "while employed by ADI he legitimately possessed those materials." [Br.33 (emphases added)]. As Yu could not have "legitimately possessed" the *final* design for the HMC1022A before it existed, he too is clearly using the same language (despite the "*the*") to include the prototype design for that chip—because that is how people normally speak.

Yu's hyper-technical gloss on Count One is also nonsensical in the context of the indictment as a whole. It would make no sense for the grand jury to allege that

---

18   The statutory-interpretation cases that Yu cites are inapt, as factual statements in an indictment are not equivalent to Acts of Congress. [Br.30-31].

Yu possessed the *final* design for the HMC1022A, as Yu asserts, while simultaneously alleging that he obtained the trade secrets by "downloading files from ADI's servers" for "several months" beginning "no later than September 2016," which was long before that final design came into being. [JA.101].

Separate from the non-existence of a variance, any variance claim would also fail on the independent ground that Yu suffered no prejudice. *See Katana*, 93 F.4th at 538 (stating that there is no prejudicial variance where the defendant had "sufficient notice of [] and was able to defend himself against" the charge). Yu knew all along that the government's theory (as presented to both the grand jury and the petit jury) was that he possessed the Count One trade secret by way of the K8600_TOP.gds file that contained the prototype design for the HMC1022A, and he has never claimed otherwise. [*E.g.*, JA.758 (not claiming otherwise)]. Count One had its genesis in Count Nine of the First Superseding Indictment, which stated that Yu "knowingly possess[ed] a trade secret owned by ADI" through "[a]n ADI GDS file titled K8600_TOP.gds" that contained "design files for [] HMC1022." [JA.3191]. Then, in discovery, at Yu's request, the government identified specific files he was alleged to have possessed that contained "[t]he design layout and GDS file for the HMC1022A microchip" and named the kids8600.jpg file, and also provided an image of the alleged Count One design, which was a picture of the HMC1022A prototype design under the prominent heading "ADI K8606 *non-*

36

*released* HMC1022A." [JA.4203, 4211 (emphasis added)]. In sum, because Yu never faced any "uncertain[ty] as to the [conduct] for which he was being prosecuted" and there was "no possibility that the [alleged] variance could have subjected [him] to double jeopardy," he was clearly not prejudiced even if there was a variance. *United States v. Brien*, 617 F.2d 299, 313 (1st Cir. 1980).

### E. The Evidence Was Sufficient to Show the Count One Trade Secret Was "Not . . . Readily Ascertainable" from the For-Sale HMC1022A Chip

Yu's next claim is that the government failed to prove the "not . . . readily ascertainable" element of the trade-secret definition because, by June 2019, the Count One design could have been reverse engineered from the HMC1022A chip that ADI released to the market in February 2019. [Br.32-34]. Yu is wrong.

First, as the government explained below, a rational jury could have found (as the government urged it to do) that it was impossible to readily ascertain the HMC1022A prototype design that Yu stole by reverse engineering the for-sale HMC1022A chip because the stolen prototype design and the design of the for-sale chip were *different*. [JA.1868-69, 1958, 3076, 3097; *see* Br.24].

Second, separate from the above theory, the government offered extensive evidence that reverse engineering a MMIC design from a physical chip is so difficult and costly that even the *final* design of a for-sale chip cannot be "readily ascertain[ed]" from that chip (much less a different prototype design). The trial

37

evidence showed that the competitive advantage in a MMIC design lies in the precise sizing, proportions, and relationships of the many components in the chip, which all "work[] together" to allow the chip to perform in a certain way. [*E.g.,* JA.1224-26, 1611, 1648-49, 1858-62, 1972, 1982, 2047-52, 2248, 2600-01]. There was evidence that the lower layers of a MMIC (which typically has between 12 to 29 layers) can be hard to discern from the finished product even with a microscope [JA.1158, 1210, 1584, 2055, 2133, 2147-48, 2438-40], and that certain parts of a MMIC design are sensitive to changes of even a few microns. [JA.1949; 2068-69, 2449-53]. Multiple engineers testified that, for these reasons, reverse engineering a working MMIC design from a physical chip is "expensive," "labor-intensive," and "very difficult." [JA.1210, 1214-15, 1222, 2083-86]. Indeed, one witness explained that this difficulty is why ADI generally does not patent its MMIC designs (unlike "those ideas [that] can be easily seen by looking at our parts") but instead uses the alternative method of protecting them through secrecy. [JA.1157-58].

The government additionally presented the testimony of an expert who had undertaken to reverse engineer a MMIC through Yu's suggested method of taking an image of the chip through a powerful microscope and "counting pixels" to determine the size and placement of various components. [JA.1996-98, 2409, 2431]. The expert concluded that, while it is possible to "reverse engineer[] [a MMIC design] from images," and it might "save a little bit of time," a person would still

38

need to "invest[] significant engineering time and resources to get the design" (including using expensive tools and software, putting in "several weeks to a month" of dedicated work to prepare a schematic and layout, and then spending more time and money on testing and likely multiple tapeouts) [JA.2414-15, 2442-61]—just as the lay witness engineers had already testified. [*E.g.,* JA.1222 ("[I]t saves you some time, but most of it you still would have to do.")]. In other words, the evidence was more than sufficient to show that, while ascertaining a MMIC design through reverse engineering is *possible*, it cannot be done *readily*.

Yu's counterarguments are unpersuasive. He offers no argument that the evidence was insufficient to support the government's first theory stated above and has therefore waived that argument. *See Mayendía-Blanco*, 905 F.3d at 32. Though he does state (in a different section of his brief) that "the verdict confirms" the jury did not rely on that theory because it acquitted him on other counts that also involved prototype designs [Br.38], that inference is impermissible. The Supreme Court has said that an acquittal does not prove "the jury was not convinced" by the government's evidence on the acquitted count as it is "equally possible that the jury" acquitted on that count while convicting on another count due to "mistake, compromise, or lenity." *United States v. Powell*, 469 U.S. 57, 65 (1984). It is thus settled law that a Court reviewing for sufficiency may not engage in any reasoning based on acquitted counts. *See United States v. Cianci*, 378 F.3d 71, 91 (1st Cir.

2004) ("Acquittals on certain counts of an indictment play no role in the analysis of whether there is sufficient evidence supporting the surviving counts."). Yu has therefore offered no cognizable challenge to the sufficiency of the government's evidence that the HMC1022A prototype design he possessed could not have been reverse engineered from the for-sale chip that had a revised design, so the Court may affirm on this ground alone.

Yu's attacks on the government's second theory on this element, however, are scarcely more substantial. Here again, Yu attempts to argue from the false premise that jury verdicts must be consistent. He contends that (a) the release of ADI's HMC1022A chip *after* Yu left ADI was the "only thing" that distinguished Count One from the other trade-secret counts (which is factually false[19]); and (b) the acquittals on those other counts prove the jury believed MMIC designs can be readily ascertained from finished chips (which is the very reasoning *Powell* prohibits); and thus (c) the jury also would have acquitted him on Count One had it not misunderstood the charge to be about Yu's theft of the information in 2017 rather than his possession of the same information in June 2019, and the Court should correct this "anomalous verdict." [Br.3, 24, 32-34]. Yu also somehow manages to

---

[19] This was not the "only" thing that distinguished Count One. Among other distinguishing factors, HMC1022A was also the only export-controlled chip as well as the only chip for which Yu started competing with ADI through Tricon chips before ADI's product even reached the market.

blame the government for this entirely speculative jury misunderstanding.[20] [Br.34]. This entire line of argument is nothing more than a fanciful version of the "inconsistent verdict" claim that *Powell* and its progeny forbid, and the Court should disregard it.

Shorn of that inappropriate framework, Yu's reverse-engineering argument boils down to blatant misstatements of the trial record. Among the most glaring[21] are his assertions that (1) the government's expert "conceded" that "the design of any MMIC is 'readily ascertainable' from the physical chip" [Br.2-3, 20-21]; (2) the trial evidence showed "the circuitry of MMICs is relatively simple" and the "material features [of a MMIC design] can be readily observed using a microscope" [Br.18]; and (3) it is "common for companies . . . to reverse engineer" their

---

[20] There is no indication the jury misunderstood the charge. The court instructed the jury on what it needed to find to convict, and Yu made no objection relevant to his argument now. The government's unobjected-to references to Yu's "theft" in its closing argument were likewise entirely appropriate. The government was required to show that Yu knew the information he possessed had been "stolen," and it argued to the jury that it could infer this from the fact that Yu was the person who stole it. [JA.3095]. Yu's "theft" also tended to show that the information was "not generally known" (hence the need to steal it) and that Yu sought it for his own "economic benefit" (*i.e.*, his motive for stealing it). *See supra* Section II.C.

[21] The government disagrees with many of Yu's characterizations of the trial evidence, such as his statement that it showed he "designed" MMICs for Tricon (rather than stealing ADI's designs and making some superficial modifications) and his assertion about the lack of evidence supporting the wire fraud, illegal export, and immigration charges. [*E.g.,* Br.1, 20, 22]. *See supra* note 2. For the sake of brevity, however, the government focuses on the misstatements most pertinent to Yu's appellate claims.

41

competitors' MMICs and, in fact, this was one of Yu's "first assignments at ADI." [Br.18]. On each point, the record directly contradicts Yu's claim. The government's expert opined that it is possible to reverse engineer a MMIC design *but only at great cost and expense* and thus not "readily," *see supra* pp. 38-39; no witness referred to the types of MMIC designs Yu stole as "simple," [*see* JA.1577, 1611-12, 1624, 1647-48, 2046, 2461]; several witnesses testified that some material features of MMIC designs *cannot* be easily discerned using a microscope, *see supra* p. 38; and the witnesses who agreed with Yu's counsel that it is "common" for companies to "reverse engineer" other company's MMICs also explained that the type of complete reverse engineering Yu was describing could not be done without the investment of a great deal of time and money [*compare* JA.1185-86, 2058, *with* JA.1215-19, 2075-76, 2084-86]. No one testified that ADI "assigned" Yu to reverse engineer another company's chip; in fact, the only testimony on that issue was that no one told Yu to design the chip through reverse engineering (and, further, that the chip in question was a "very low frequency design" that was significantly more tolerant of changes than other MMICs). [JA.1186-88, 2714-15, 2725-26].

> ### F. The Evidence Was Sufficient to Show the HMC1022A Prototype Design Yu Possessed "Derive[d] Independent Economic Value . . . from Not Being Generally Known [or] Readily Ascertainable"

Yu also argues that the HMC1022A design he stole did not "derive[] independent economic value" from secrecy, as required under the definition of a

42

competitors' MMICs and, in fact, this was one of Yu's "first assignments at ADI." [Br.18]. On each point, the record directly contradicts Yu's claim. The government's expert opined that it is possible to reverse engineer a MMIC design *but only at great cost and expense* and thus not "readily," *see supra* pp. 38-39; no witness referred to the types of MMIC designs Yu stole as "simple," [*see* JA.1577, 1611-12, 1624, 1647-48, 2046, 2461]; several witnesses testified that some material features of MMIC designs *cannot* be easily discerned using a microscope, *see supra* p. 38; and the witnesses who agreed with Yu's counsel that it is "common" for companies to "reverse engineer" other company's MMICs also explained that the type of complete reverse engineering Yu was describing could not be done without the investment of a great deal of time and money [*compare* JA.1185-86, 2058, *with* JA.1215-19, 2075-76, 2084-86]. No one testified that ADI "assigned" Yu to reverse engineer another company's chip; in fact, the only testimony on that issue was that no one told Yu to design the chip through reverse engineering (and, further, that the chip in question was a "very low frequency design" that was significantly more tolerant of changes than other MMICs). [JA.1186-88, 2714-15, 2725-26].

### F. The Evidence Was Sufficient to Show the HMC1022A Prototype Design Yu Possessed "Derive[d] Independent Economic Value . . . from Not Being Generally Known [or] Readily Ascertainable"

Yu also argues that the HMC1022A design he stole did not "derive[] independent economic value" from secrecy, as required under the definition of a

trade secret, because that design was (in Yu's words) "merely an early attempt to 'translate' a legacy design that had been on the market for years and that closely resembled competitor chips." [Br.35]. This claim fails too.

The government introduced evidence that translations are valuable, even though they nearly always involve "legacy design[s] that ha[ve] been on the market for years." The only reason a company like ADI would pour resources into translating a legacy chip is because it wants to continue selling a profitable product. [JA.1118-19]. The government also offered evidence that MMIC "prototypes" (which are included within § 1839(3)'s definition of what can constitute a "trade secret") have "independent economic value." Even a prototype MMIC design reflects a major engineering investment, and having access to one provides a "significant leg up" in terms of time and cost savings toward a final design. [JA.1141, 2031-32, 2676-77]. A rational jury also could have inferred that Yu would not have stolen the prototype design—and could not have successfully converted it into his own TM5051 and TM5052 chips on the very first tapeout—if that prototype design was not "useful" to him. [Br.36]. Furthermore, despite Yu's claim that the HMC1022 "closely resembled competitor chips" [Br.35], when Yu produced the TM5051 and TM5052 and the ADI translation had yet to hit the market, Yu boasted to one customer that "you can hardly find anything in the market that matches our performance." [JA.3597].

Yu's contrary arguments are unavailing. The existence of a final for-sale design does not deprive the prototype designs of independent economic value based on secrecy. As the trial evidence showed, and basic logic confirms, no company wants a competitor to be able to use the company's prototype design, created at great expense, to quickly fabricate a competitive chip without a similar investment—and that remains the case even if the company itself is selling a revised final design. [*See* JA.1152-53, 1157, 1670].

Moreover, although Yu repeatedly refers to the HMC1022A design that he stole as an "abandoned prototype" [Br.22-25, 31-32, 35, 37-40], that is not what the evidence showed. The transcript makes clear that Yu's lawyer suggested that characterization, but the witness did not agree. What the witness said instead was that ADI abandoned *the legacy TriQuint-manufactured chip* (HMC1022) and replaced it with a Win-manufactured translation (HMC1022A). [JA.1957-58 ("[DEFENSE COUNSEL]: [E]ventually ADI abandoned the HMC 1022A and took this design in a different direction, is that right? THE WITNESS: Um, yes, we stopped selling the 1022 and released the 1022A.")]. The witness then explained that the *version* of the translation Yu stole was not the final design but a "prototype along the way," *i.e.*, a revision within the design process of getting closer and closer to the target. [JA.1958, 2676]. To remove all doubt, the court then asked the witness to confirm that he was making two distinct points (one about ADI going "in a

different direction" from the legacy chip and a separate point about which version of the resulting translation Yu stole), and the witness agreed. [JA.1958 ("THE COURT: So, um, the question is correct in that the original, um, the company went in a different direction [*i.e.*, from the HMC1022], but what you're being shown is a prototype, not what was ultimately released, is that correct? THE WITNESS: That is correct.")].

Yu states that "the potential savings of time and money from having access to a prototype design file as a 'short cut'"—which as noted above, multiple witnesses testified to—"does not prove that this prototype design itself constitutes or contains any 'trade secret,' *if the material features of that design—or the final product—are all generally known or readily ascertainable.*" [Br.37 (emphasis added)]. This is just a rehash of his failed reverse-engineering argument. If the italicized caveat is removed and one assumes the HMC1022A design was *not* generally known or readily ascertainable, as the government proved, *see supra* Section II.E, then the fact that the prototype design Yu stole functioned as a "short cut" to creating a competitive chip clearly *did demonstrate* that the prototype derived "independent economic value" from being kept secret.

Yu's final salvo is that the government did not "elicit any testimony or present other evidence establishing the existence of any valuable 'secret' features of the abandoned HMC1022A prototype design." [Br.37]. This is a red herring. As stated

above, multiple witnesses testified that the secret in a MMIC design resides in how the myriad components of the design, as precisely sized and situated, work together to produce the desired performance, *see supra* pp. 37-38, and it has long been the law that a trade secret can exist in this type of "compilation[]." *See Allstate Ins. Co.*, 79 F.4th at 189 ("[T]he inclusion of some information in compilations which could have been obtained from public sources does not mean the compilations were not trade secrets[.]"); *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) (holding that "a compilation that affords a competitive advantage and is not readily ascertainable falls within the definition of a trade secret" even if the source information is public); *see also, e.g.*, *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process design and operation of which in unique combination affords a competitive advantage and is a protectable trade secret" (citation omitted)); *Boeing Co. v. Sierracin Corp.*, 108 Wash.2d 38, 738 P.2d 665, 675 (1987) (holding that "trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets").[22]

---

[22] Yu also complains about the district court's answer to a jury question about the "injury" element. [Br.34-35 n.9]. The government disagrees that the Court's answer was improper, but as Yu has chosen not to appeal the issue, will not respond in substance.

**G.** **Section 1832 Does Not Require the Defendant to "Know[]" that the Information Possessed Qualifies As a "Trade Secret" under the Statute**

Yu's last sufficiency challenge is his claim that the government was required to prove that he *knew* the Count One information qualified as a "trade secret" but failed to do so. [Br.28, 38-41]. For the existence of this purported knowledge requirement, Yu cites only the district court's jury charge. [Br.28].

Sufficiency review is governed not by the jury instructions but by the statute itself, *see Musacchio v. United States*, 577 U.S. 237 (2016), and as the government pointed out to the district court, the statute provides no support for Yu's contention that the government must prove the defendant *knew* the trade secret was a "trade secret." [JA.3008]. The text does not say that, and the Court may presume that choice was deliberate on Congress's part because there is another provision in the Economic Espionage Act that *does* say that. *See* § 1839(5)(B)(iii) (stating that the person must have "kn[own] or had reason to know that . . . (I) the trade secret was a trade secret"). *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

The case law does not support Yu's posited (atextual) knowledge requirement either. *See United States v. You*, 74 F.4th 378, 393 (6th Cir. 2023) ("The district

court correctly instructed the jury on the mens rea requirements for . . . trade-secret theft. The jury did not need to find that [the defendant] knew that the information met each element in the EEA's definition of a 'trade secret.' It was enough for the jury to find that [she] knew that she was taking confidential information to which [s]he had no claim." (cleaned up)). In fact, although some out-of-circuit district courts have held that the economic espionage statute, § 1831, requires the defendant to know the information was a "trade secret," the government knows of no case that has said that with respect to § 1832, and as one district court pointed out, the phrasing on which courts have relied in inferring that requirement in § 1831 is *different* in § 1832. *See United States v. O'Rourke*, 417 F. Supp. 3d 996, 1005 (N.D. Ill. 2019) (distinguishing § 1831, which "criminalizes knowingly stealing or communicating a *trade secret*," from § 1832, which criminalizes "knowingly stealing or communicating *such information*").

This Court's only published opinion applying § 1832 is in accord. The Court in that case resolved a sufficiency challenge to the defendant's conviction of conspiring to violate § 1832 without giving any indication the government was required to prove the defendant *knew* the trade secret was a trade secret. *See United States v. Martin*, 228 F.3d 1, 12-13 (1st Cir. 2000). Moreover, even if one assumes that *Martin* does (*sub silentio*) support Yu's knowledge requirement, then for the same reason the Court found the evidence sufficient there, it should do so here. The

Court reasoned in *Martin* that there was enough evidence to establish the conspiracy because, among other things, the defendant "received extensive correspondence from [his co-conspirator] that she had either marked 'confidential' or 'proprietary,' or had expressed some hesitation in forwarding," and he accepted that material. *Id.* at 12. Similarly, in this case, the evidence that Yu signed numerous confidentiality agreements with ADI, knew ADI took measures to keep MMIC designs (including prototype designs) secret, tried to conceal his thefts from ADI in various ways, and then asked Win to treat *his GDS file* of MMIC designs as "proprietary data" supported a reasonable inference that Yu knew the Count One information he possessed was a trade secret.

## CONCLUSION

For these reasons, the government respectfully requests that the Court affirm the judgment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   /s/ *Karen L. Eisenstadt*
Karen L. Eisenstadt
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE WITH
## Rule 32(a)

### Certificate of Compliance with Type-Volume Limit,
### Typeface Requirements, and Type-Style Requirements

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,038 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2019.

/s/ *Karen L. Eisenstadt*
Karen L. Eisenstadt
Assistant U.S. Attorney

Dated:  February 25, 2025

## CERTIFICATE OF SERVICE

I, Karen L. Eisenstadt, Assistant U.S. Attorney, hereby certify that on February 25, 2025, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

William W. Fick
Daniel N. Marx
Amy Barsky
Fick & Marx LLP
24 Federal Street, 4th Floor
Boston, MA 02110

/s/ *Karen L. Eisenstadt*
Karen L. Eisenstadt
Assistant U.S. Attorney