No. 23-1585
No. 24-1325

_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

UNITED STATES OF AMERICA,
*Appellee,*

v.

HAOYANG YU, a/k/a Jack Yu, a/k/a Harry Yu, a/k/a Jack Tricon,
*Defendant-Appellant.*
_____

On Appeal from the United States District Court
for the District of Massachusetts (Young, J.)
_____

**REPLY BRIEF OF DEFENDANT-APPELLANT
HAOYANG YU**
_____

William W. Fick (1st Cir. # 82686)
Daniel N. Marx (1st Cir. # 1150876)
Amy Barsky (1st Cir. # 1174212)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM
ABARSKY@FICKMARX.COM

*Attorneys for Defendant-Appellant
Haoyang Yu*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ii

ARGUMENT .........................................................................................1

I.    THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE SINGLE COUNT OF CONVICTION FOR UNLAWFUL POSSESSION OF A TRADE SECRET. ..........................................1

    A.    Mr. Yu never possessed the "trade secret" alleged in Count One. ..........................................................................................1

    B.    The design layout and GDS file for the HMC1022A was not a "trade secret" on or about the date of the alleged offense in June 2019 because the chip was publicly available for sale by that date. ................................................................................14

    C.    Evidence failed to prove the design layout and GDS file for an abandoned HMC1022A prototype design constituted or contained any "trade secret." ................................................16

    D.    The evidence failed to establish that Mr. Yu knew he possessed any trade secret. ....................................................17

II.    THE DISTRICT COURT ERRED IN DENYING MR. YU'S MOTION TO DISMISS DUE TO UNCONSTITUTIONAL SELECTIVE ENFORCEMENT AND PROSECUTION. ..............23

    A.    Legal Standard.....................................................................24

    B.    Clear Evidence Established Discriminatory Effect..............26

    C.    Clear Evidence Established Discriminatory Intent. ............28

    D.    The District Court Erred in Denying the Motion to Dismiss. ...............................................................................30

CERTIFICATE OF COMPLIANCE.......................................................32

CERTIFICATE OF SERVICE...............................................................33

# TABLE OF AUTHORITIES

## Cases

*United States v. Alcaraz-Arellano,* 441 F.3d 1252
(10th Cir. 2006)...........................................................................24

*Alston v. International Association of Firefighters, Local 950,*
998 F.3d 11 (1st Cir. 2021).........................................................25

*Analog Devices, Inc. v. Macom Tech. Solutions Holdings, Inc.*,
No. 18-cv-11028-GAO (D. Mass.)................................................27

*Analog Devices, Inc. v. Michalski*, 579 S.E.2d 449
(N.C. Ct. App. 2003)...................................................................16

*Armstrong v. United States*, 517 U.S. 456 (1996)..............................24, 25

*United States v. Brandao*, 539 F.3d 44 (1st Cir. 2008)............................2

*United States v. Brandon*, 17 F.3d 409 (1st Cir. 1994)……………………6

*United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005)........................8

*United States v. Chung*, 633 F. Supp. 2d 1134 (S.D. Cal. 2009)............20

*United States v. Crocker*, 568 F.2d 1049 (3d Cir. 1977)...........................8

*United States v. Cruz-Arroyo*, 461 F.3d 69 (1st Cir. 2006).....................13

*United State v. Cusmano*, 659 F.2d 714 (6th Cir. 1981)..........................8

*United States v. Davis*, 793 F.3d 712 (7th Cir. 2015).............................25

*United States v. DeCicco*, 439 F.3d 36 (1st Cir. 2006)..............................5

*United States v. Dowdell*, 595 F.3d 50 (1st Cir. 2010)..............................5

*United States v. Farr*, 536 F.3d 1174 (10th Cir. 2008)..............................8

*Flores-Figueroa v. United States*, 556 U.S. 646 (2009)............................18

*United States v. Fornia-Castillo*, 408 F.3d 52 (1st Cir. 2005)..................5

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)....................................25

*United States v. Hsu*, 155 F.3d 189 (3d Cir. 1998).................................22

*United States v. Jin*, 833 F. Supp. 2d 977 (N.D. Ill. 2012)...............20, 22

*United States v. Jones*, 399 F.3d 640 (6th Cir. 2005)............................24

*United States v. Katana*, 93 F.4th 521 (1st Cir. 2024)........................2, 5

*United States v. Keller*, 916 F.2d 628 (11th Cir. 1990)............................8

*United States v. Leichnam*, 948 F.2d 370 (7th Cir. 1991) ......................8

*Mandel v. Boston Phoenix, Inc.*, 492 F. Supp. 2d 26 (D. Mass. 2007).....25

*United States v. Martin*, 228 F.3d 1 (1st Cir. 2000)..............................22

*United States v. Miller*, 471 U.S. 130 (1985)...................................2, 3, 4

*United States v. Miller*, 891 F3.d 1220 (10th Cir. 2018).........................7

*United States v. Mubayyid*, 658 F.3d 35 (1st Cir. 2011)...........2, 5, 10, 11

*Musacchio v. United States*, 577 U.S. 237 (2016)...................................17

*United States v. O'Rourke*, 417 F. Supp. 3d 996 (E.D. Ill. 2019)......19, 20

*United States v. Randall*, 171 F.3d 195 (4th Cir. 1999)............................8

*Rehaif v. United States*, 588 U.S. 225 (2019)............................................20

*United States v. Roshko*, 969 F.2d 1 (2d Cir. 1992)...........................10, 11

*Stirone v. United States*, 361 U.S. 212 (1960)..................................*passim*

*Wayte v. United States*, 470 U.S. 598 (1985)......................................24, 30

*United States v. You*, 74 F.4th 378 (6th Cir. 2023)..................................20

*United States v. Zingaro*, 858 F.2d 94 (2d Cir. 1988)...............................8

**Statutes**

18 U.S.C. § 1028A......................................................................................18
18 U.S.C. § 1831..........................................................................................19
18 U.S.C. § 1832..................................................................................6, 17, 18
18 U.S.C. § 1839....................................................................................18, 21

**Other Authorities**

Madeleine Greene and Jeanne Batalova, *Chinese Immigrants in the United States*, Migration Policy Institute (Jan. 15, 2025).....................63

# ARGUMENT

Defendant-Appellant Haoyang Yu respectfully submits this Reply to address selected arguments in the prosecution's Brief.[1]

## I. THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE SINGLE COUNT OF CONVICTION FOR UNLAWFUL POSSESSION OF A TRADE SECRET.

### A. Mr. Yu never possessed the "trade secret" alleged in Count One.

The prosecution concedes that Mr. Yu *never* possessed "the design layout and GDS file for the HMC1022A microchip," the singular, specific "thing" that the grand jury alleged to be a "trade secret" as the defining element of the offense charged in Count One.

Mr. Yu argued below and in his Opening Brief that this failure of proof requires acquittal, and any broadening of the indictment to permit conviction on Count One based on evidence concerning possession of files related to a different, abandoned prototype would constitute an impermissible constructive amendment, would be inherently prejudicial, and requires reversal. YBR30-32; JA655-658,751-758.

---

[1] "PBR" refers to the prosecution's Brief; "YBR" refers to Mr. Yu's Opening Brief; "ADD" refers to the Addendum; "JA" refers to the Joint Appendix; and "DE" refers to district court docket entries.

The prosecution incorrectly contends that Mr. Yu is really making an unpreserved claim of "variance," and that any such variance was not prejudicial. PBR33-37.

As this Court has recognized, the Supreme Court set boundaries constraining constructive amendment of an indictment in two seminal cases: *Stirone v. United States*, 361 U.S. 212 (1960), and *United States v. Miller*, 471 U.S. 130 (1985). *See, e.g., United States v. Mubayyid*, 658 F.3d 35, 49-55 (1st Cir. 2011) (discussing *Stirone* and *Miller*); *United States v. Brandao*, 539 F.3d 44, 57 (1st Cir. 2008) (analyzing constructive amendment argument under *Stirone*).[2]

---

[2] In dicta, *United States v. Katana*, 93 F.4th 521, 532 (1st Cir. 2024), stated: in "the terminology of our modern jurisprudence . . . *Stirone* is more appropriately characterized as a prejudicial variance case, rather than a constructive amendment case." But *Katana* did not purport to overrule *Mubayyid*, *Brandao*, or any of this Court's other cases analyzing constructive amendment claims under *Stirone*. Moreover, *Katana* did not even mention *Miller*, in which the Supreme Court elaborated on *Stirone*. Nor did *Katana* explain any disagreement with the thousands of appellate opinions across the circuits treating *Stirone* as the seminal case underlying the "constructive amendment" doctrine. No matter how Mr. Yu's argument is labeled, the substance is preserved and consistent: the prosecution failed to prove an essential element of the crime that the grand jury charged in Count One. Expansion of the indictment to encompass facts the grand jury did not allege would be impermissible under *Stirone* and its progeny, whether such broadening is characterized as a "constructive amendment" or "prejudicial variance."

*Stirone* established that the Constitution does not "permit a defendant to be tried on charges that are not made in the indictment against him." *Miller*, 471 U.S. at 143. Therefore, "'after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.'" *Id.* (quoting *Stirone*, 361 U.S. at 215-16). In *Stirone*, the indictment charged use of extortion and threats to interfere with interstate *sand* deliveries. *See* 361 U.S. at 213-14. At trial, however, the prosecution's presentation also included evidence of interference with interstate *steel* shipments. The Supreme Court reversed the conviction.

> [I]t cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned. Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same. And the addition charging interference with steel exports here is neither trivial, useless, nor innocuous. While there was a variance in the sense of a variation between pleading and proof, that variation here destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error. The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to

offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. Thus the basic protection the grand jury was designed to afford is defeated by a device or method which subjects the defendant to prosecution for interference with interstate commerce which the grand jury did not charge.

*Id.* at 217-18. Critically, *Stirone* did not require the defendant to show any prejudice other than deprivation of the "basic right" to "be tried only on charges returned by a grand jury." *Id.*

*Miller*, in turn, defined the limits of this concept, holding that a constructive amendment did not occur when a defendant was convicted of conspiracy based on proof of a criminal plan *narrower than, but fully included within*, the plan set forth in the indictment. *See* 471 U.S. at 137. In reaching this result, the Supreme Court reaffirmed *Stirone*'s holding that a defendant cannot be convicted on facts "not fully contained in the indictment" and that it would be error to allow "trial evidence [to] 'amend[ ]' the indictment by *broadening* the possible bases for conviction from that which appeared in the indictment." *Id.* at 138 (emphasis in original).

Cases in which this Court has found no constructive amendment fall squarely within the ambit of *Miller*, where the evidence at trial

proved an offense narrower than or encompassed within the one charged. *See, e.g.*, *Katana*, 93 F.4th at 535 (explaining language of indictment encompassed both robbery of individual and his home business); *Mubayyid*, 658 F.3d at 54 (finding no constructive amendment due to "*narrowing* of the conspiracy that occurred in this case" and holding "single, unitary object" is not "essential element" of conspiracy offense) (emphasis added); *United States v. Dowdell*, 595 F.3d 50, 69 (1st Cir. 2010) (holding amendment of indictment changing "cocaine" to "cocaine base" permissible because "cocaine base is merely an isomer of cocaine . . . . The government could have proffered evidence of distribution of cocaine base and still carried its burden of proving distribution of 'cocaine'"); *United States v. DeCicco*, 439 F.3d 36, 46 (1st Cir. 2006) (finding no constructive amendment where indictment charged two fraud theories and trial evidence established one of them); *United States v. Fornia-Castillo*, 408 F.3d 52, 66 (1st Cir. 2005) (finding no constructive amendment where discrepancy about whether defendant was owner or mere transporter of drugs is not constructive amendment because "role" is not element of conspiracy).

The prosecution erroneously contends that there was no constructive amendment here because the underlying statutory offense—violation of 18 U.S.C. § 1832(a)(3)—did not change. PBR33-34. However, the "offense" charged in Count One was not a generic violation of section 1832(a)(3). Instead, the prosecution chose to bring an indictment containing twelve separate counts alleging separate violations of section 1832(a)(3), each of which identified a particular alleged "trade secret" as an essential element.[3]

Having made that charging decision, the prosecution must be held to the grand jury's findings, consistent with *Stirone*. There, the Supreme Court explained, "there are two essential elements of a Hobbs Act crime: interference with commerce and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage."

---

[3] By bringing the indictment in the form it did, with multiple counts, each alleging possession on the same day of a specific trade secret, the prosecution necessarily took—and now must maintain—the position that that each possession of a particular trade secret is a separate, distinct offense, of which the specified trade secret is an essential element. Otherwise, the indictment would be unlawfully multiplicitous by dividing a single offense into multiple counts. *See United States v. Brandon*, 17 F.3d 409, 422 (1st Cir. 1994) ("An indictment is multiplicitous and in violation of the Fifth Amendment's Double Jeopardy Clause if it charges a single offense in more than one count.").

361 U.S. at 218. "It follows that *when only one particular kind of commerce is charged* to have been burdened *a conviction must rest on that charge and not another*, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened." *Id.* (emphasis added).

Likewise here, where Count One charged possession of a particular trade secret—the design layout and GDS file for the HMC1022A microchip—the conviction must rest on "that charge and not another," *id.*, even assuming, *arguendo*, that an indictment drawn in general terms might rest upon showing unlawful possession of that specific information "or another," *id.*, such as an abandoned prototype design.

Numerous progeny of *Stirone* and *Miller* confirm: "it is settled law . . . that the language employed by the government in its indictments becomes an essential and delimiting part of the charge itself such that if an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars." *United States v. Miller*, 891 F3.d 1220, 1235 (10th Cir. 2018) (collecting cases). The possibility that the jury convicted based on facts other than those alleged

in the indictment requires reversal even if those other facts could have

satisfied the essential elements of a generically worded indictment.[4] And

---

[4] For over 40 years, every other circuit to address the issue in a published decision has applied the same reasoning. *See, e.g.*, *United States v. Farr*, 536 F.3d 1174, 1181 (10th Cir. 2008) (reversing conviction where prosecution proved tax liability different from that alleged in indictment; "Had the government simply charged [defendant] generically under section 7201 with willful evasion of a tax, we might have had a different situation. But it did not. Instead, the government opted to include in its indictment particulars about the nature of the tax at issue[.]"); *United States v. Chambers*, 408 F.3d 237, 247 (5th Cir. 2005) (reversing felon-in-possession conviction where evidence concerning ammunition at trial did correspond to specific ammunition alleged to meet "interstate commerce" element in indictment) (collecting cases); *United States v. Randall*, 171 F.3d 195, 209 (4th Cir. 1999) (reversing section 924(c) conviction where government proved predicate offense different from one charged in indictment); *United States v. Leichnam*, 948 F.2d 370, 379 (7th Cir. 1991) (reversing conviction where trial evidence included three guns but indictment specified one particular gun; "Obviously, the government could easily have drawn up [defendant's] indictment to charge him simply with having used or carried 'a firearm.' But it did not do so, and the description it gave of the gun in the indictment, 'to wit a Mossberg rifle, Model 250CA with no serial number,' was not merely surplusage. That is true as a matter of law. By the way the government chose to frame [the] indictment, it made the Mossberg an essential part of the charge and limited the bases for possible conviction to the Mossberg."); *United States v. Keller*, 916 F.2d 628 (11th Cir. 1990) (reversing where evidence of possible co-conspirators broader than specific co-conspirator named in indictment); *United States v. Zingaro*, 858 F.2d 94, 103 (2d Cir. 1988) (reversing RICO conspiracy conviction where evidence included loan not referenced indictment); *United State v. Cusmano*, 659 F.2d 714 (6th Cir. 1981) (reversing Hobbs Act conviction where evidence included threats of violence but indictment only charged threats of economic loss); *United States v. Crocker*, 568 F.2d 1049, 1060 (3d Cir. 1977) (reversing false statement conviction where

here, that possibility was a certainty—there was no evidence that Mr. Yu possessed the HMC1022A design file as alleged, so the jury necessarily convicted him based on different evidence of the abandoned prototype.

The prosecution contends that the definite article "the" in "common parlance does not necessarily imply a 'final' version rather than any other version of the same thing." PBR35. This distorts Mr. Yu's argument. "The" standing alone does not, itself, connote *finality*. But it does connote *singularity* and *specificity*—"*the* design layout and GDS file for *the* HMC1022A microchip"—*one* specific design layout and GDS file for *one* specific microchip, an actual released product with a name.[5] A prototype design created but abandoned in the process of developing that microchip is something different.[6]

---

trial evidence supported theory of falsity different from that charged in indictment).

[5] The prosecution offers neither any competing definition of "the" nor any authority supporting its baseless assertion that statutory interpretation cases are categorically "inapt" because indictments are "not equivalent to Acts of Congress." PBR35.n.1.

[6] The prosecution faults Mr. Yu for using the language of the indictment in his separate argument about timing—whether design of the HMC1022A could be a trade secret on the date of the alleged offense, YBR33—but any supposed ambiguity in that argument, which the Court would reach only in the event it rejects Mr. Yu's constructive amendment

The prosecution impugns Mr. Yu's argument as "hypertechnical gloss." But word choices carry meaning and consequences. The Second Circuit's decision in *United States v. Roshko*, 969 F.2d 1 (2d Cir. 1992), discussed with approval by this Court in *Mubayyid*, is instructive. *Roshko* turned on use of the indefinite article—"a"—in the indictment to specify a singular person as distinguished from, potentially, more than one person.

> [*Roshko*] involved a conspiracy to defraud the United States whose object was expressly defined as "seeking changes in the immigration status of an alien based on a sham marriage to a United States citizen that was falsely represented to be genuine." *Roshko*, 969 F.2d at 2. At trial, the government introduced evidence that the defendant had conspired in the marriage of her future husband, an immigrant from Israel, to a United States citizen, in order to secure his green card. *Id.* at 3. It further offered evidence of that couple's subsequent divorce and of the defendant's marriage to her now-permanent-resident-alien husband (which ultimately resulted in her successful application for a green card). *Id.* When the defendant raised a statute of limitations challenge to the evidence of her husband's sham marriage, the government argued that the conspiracy broadly embraced both marriages, and that the prosecution was therefore timely. *Id.* at 4. The Second Circuit, emphasizing that the

---

argument, is not a concession that "the" could encompass plural designs, or both a prototype and the named released product.

indictment specifically charged a purpose to change the status of "an alien" through marriage to "*a* United States citizen," found that the indictment was not so broad as the government claimed. *Id.* at 5-6 (emphasis added). It held that the unlimited introduction of evidence related to the second marriage, combined with the government's arguments that such conduct was part and parcel of the conspiracy, was impermissible because it "could easily have created a basis for conviction which the grand jury did not intend to create." *Id.* at 6.

*Mubayyid*, 658 F.3d at 51. "*Roshko* thus stands for the unobjectionable proposition that the government's broadening of an indictment's charges through proof at trial constructively amends an indictment." *Id.* Similarly here, the prosecution impermissibly broadened the indictment's charge alleging possession of "*the* design layout and GDS file for *the* HMC1022A" through proof at trial concerning possession of design layout and GDS files for a different, abandoned prototype.

The prosecution asserts it would be "nonsensical" for the grand jury to allege that Mr. Yu possessed the "final" design for the HMC1022A because he downloaded files "long before that final design came into being." PBR36. But the indictment did not specify any release date. The prosecution's argument is a red herring because the required legal analysis compares the indictment the grand jury returned to the evidence

that the prosecution presented at trial, and does not inquire into why the grand jury did what it did. To the extent there may be any confusion regarding the chronology or the design files at issue, the prosecution is to blame, not the grand jury; the prosecution prepared the indictment and asked the grand jury to return it as drafted. Here, the evidence simply did not match the allegation contained in the indictment, and so Mr. Yu must be acquitted.

Finally, assuming Mr. Yu's argument sounds in "variance" rather than "constructive amendment," the prosecution contends Mr. Yu has not shown prejudice. PBR36. But as noted above, under *Stirone,* Mr. Yu was deprived of his "basic right" to "be tried only on charges returned by a grand jury," and that prejudice requires reversal. 361 U.S. at 217-18.

Moreover, as Mr. Yu explained in the district court, JA758, he suffered other forms of prejudice. The prosecution contends Mr. Yu "knew all along that the government's theory . . . was that he possessed the Count One trade secret" by way of a GDS file "that contained the prototype design for the HMC1022A." PBR36. However, the Court must focus not on what the defense supposedly "knows" from extrinsic information but whether "the *indictment* provides the defendant with

sufficient detail to allow him to prepare a defense, avoid unfair surprise at trial, and plead double jeopardy when appropriate." *United States v. Cruz-Arroyo*, 461 F.3d 69, 77 (1st Cir. 2006) (emphasis added).[7]

Even with the benefit of discovery, the defense did not appreciate that there were significant differences between the "prototype" described in discovery and the final HMC1022A chip until mid-trial, based on testimony. And even then, the defense was not aware until closings that the prosecution would misleadingly emphasize the release date of the final HMC1022A chip in its arguments to the jury. As a result, the

---

[7] The prosecution's observations about supposed "notice" provided to Mr. Yu by prior indictments in the case, PBR36, actually undermine its argument. Trade secret counts in earlier indictments charged possession of broader collections of materials—*e.g.*, "performance data and specifications, schematics, design layout and modeling files, manufacturing and fabrication process, and testing procedures" for various microchips (JA3189)—and/or specific named computer files—*e.g.*, "[a]n ADI GDS file titled K8600_TOP.gds." JA3191. In the operative Third Superseding Indictment, the trade secret counts were formulated differently and more narrowly, each alleging possession of "the design layout and GDS file" for one particular named released microchip. JA110. Designation of the HMC1022A in Count One was the prosecution's intentional choice, not inadvertent error. Indeed, when the prosecution came to believe before trial that it had inadvertently specified the wrong microchip in one of the other (acquitted) counts, it moved to correct the indictment. DE196 (prosecution's unopposed motion to correct indictment "typographical" error and replace HMC906 with HMC906A in Count Four).

defense did not do a "deep dive" investigation into the development and any sales history of prototypes before trial. After all, the prototype was not charged. After trial, ironically, the prosecution argued that it was too late to introduce newly discovered evidence about the prototype, including evidence that even the prototype had been publicly available for sale (and thus, its features "readily ascertainable") before Mr. Yu released his similar products. JA686-706,742-750.

**B. The design layout and GDS file for the HMC1022A was not a "trade secret" on or about the date of the alleged offense in June 2019 because the chip was publicly available for sale by that date.**

The prosecution does not plausibly[8] dispute that the only meaningful feature distinguishing the HMC1022A, charged in Count One, from the microchips charged in acquitted counts, is that it was publicly released in February 2019, after Mr. Yu had left ADI. Nor can the prosecution deny that it misleadingly argued in closing that Mr. Yu "stole" chip designs while at ADI before corresponding products "were

---

[8] The prosecution notes, PBR40.n.1, that the HMC1022A was "the only export controlled chip" charged in the indictment, but that would not affect whether the design qualified as a "trade secret." It also notes that the HMC1022A "was the only chip for which Mr. Yu started competing with ADI . . . before ADI's product even reached the market," *id.*, but that just restates the "release date" distinction using other words.

public in any form," even though he was charged with possession in June 2019, not theft in 2017 (or earlier).

Instead, the prosecution simply speculates the jury could have found that the abandoned, never-released prototype contained trade secrets, or that even the design of the final released product never became readily ascertainable. PBR37-42. The evidence does not support such speculation.

As to the former point, even though the abandoned prototype design never became public, to qualify as a "trade secret," it must have had independent economic value. No evidence established the abandoned prototype had value at any time, *see* Section C below, much less on or around the date charged in the indictment, well after public release of the final, better product.

As to the latter point, the prosecution conflates the difficulty and expense of ascertaining key technical features of a product, which bears on whether it contains trade secrets, PBR31-33, with the supposed time and expense of going on to create similar competing products, PBR38-40, which does not. The prosecution's own expert was unequivocal: an engineer with relevant knowledge can take a MMIC, look at it under a

microscope and discern the information required to manufacture a competing product. Once that is done, there is no more "secret." The supposed challenges of bringing new products to market is beside the point.

## C. Evidence failed to prove the design layout and GDS file for an abandoned HMC1022A prototype design constituted or contained any "trade secret."

The prosecution points to no specific evidence that the abandoned prototype design had any independent economic value at any time, much less after the final "translated" product was publicly available. PBR42-46. Generalities aside, during trial, the prosecution failed to identify any specific "secret" valuable feature of the HMC1022A prototype, and it still has not done so. *Cf. Analog Devices, Inc. v. Michalski*, 579 S.E.2d 449, 468-469 (N.C. Ct. App. 2003) (denying preliminary injunction in civil case because "Analog has failed to show what, if anything, in these schematics is specifically deserving of protection. Instead, Analog has made general claims . . . . Analog invites this Court to acknowledge the existence of trade secrets in the submitted information without bearing the burden of identifying those trade secrets.").

**D.   The evidence failed to establish that Mr. Yu knew he possessed any trade secret.**

Tracking the plain language of 18 U.S.C. § 1832, the district court instructed the jury that "the government must prove not only that the information [specified in each count] was in fact a trade secret, but that Mr. Yu knew it was a trade secret." JA3050. The prosecution objected (without substantive argument or citations) to such an instruction at the charge conference, JA3008, but did not renew its objection after the district court gave the instruction, nor did it invoke *Musacchio v. United States*, 577 U.S. 237 (2016), to contend the instruction was legally erroneous when it responded to Mr. Yu's post-trial sufficiency challenge in the district court. JA725-726. Accordingly, the prosecution has waived the argument it attempts to make for the first time on appeal against an "actual-knowledge-of-trade-secret" requirement, which is an issue of first impression in this Circuit.

The prosecution is also wrong on the merits. Section 1832 provides in relevant part:

> (a) Whoever, with the intent to convert a *trade secret*, that is related to a product or service used or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing

that the offense will injure any owner of that trade secret, *knowingly* …

> (3) receives, buys, or possesses *such information*, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

violates the statute. 18 U.S.C. § 1832(a)(3) (emphasis added). "*[S]uch information,*" in subsection (a)(3) (emphasis added), plainly refers back to "*trade secret*" in the first sentence of subsection (a), which is separately defined as "all forms and types of financial, business, scientific, technical, economic, or engineering *information*" that meets certain additional criteria. *Id.* § 1839(3) (emphasis added).

Consistent with "ordinary English usage," courts "read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element." *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009). In *Flores-Figueroa*, the Supreme Court interpreted a statute that imposed an enhanced penalty if, during the commission of certain predicate crimes, the defendant "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." *Id.* at 1888 (quoting 18 U.S.C. § 1028A(a)(1)). The Supreme Court concluded "knowingly" modifies not only the verbs but also the object of those verbs—"a means of

identification of another person." Similarly here, "knowingly" modifies the verbs and the object—"such information," *i.e.*, the trade secret at issue. This conclusion is reinforced because a defendant could not conceivably possess something with "intent to convert a trade secret" without knowledge that the "something" is, in fact, a "trade secret."

Several courts have held that the prosecution must prove the defendant knows the object of the offense is a trade secret under a different provision of the Economic Espionage Act ("EEA") 18 U.S.C. § 1831. *See, e.g.*, *United States v. Jin*, 833 F. Supp. 2d 977 (N.D. Ill. 2012); *United States v. Chung*, 633 F. Supp. 2d 1134, 1145 (S.D. Cal. 2009). That provision provides:

> (a) In General. Whoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly—
>
> …
>
> > (3) receives, buys, or possesses a trade secret, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

violates the statute. 18 U.S.C. § 1831.

In *United States v. O'Rourke*, 417 F. Supp. 3d 996 (E.D. Ill. 2019), cited by the prosecution, PBR48, the court observed that section 1831

"criminalizes knowingly stealing or communicating a *trade secret*" while section 1832 criminalizes "knowingly stealing or communicating *such information*." *Id*. at 1005 (emphasis added). On that basis, the court concluded, section 1832 "does not explicitly require that the defendant know he is stealing, downloading, or possessing a trade secret." *Id*. This reading, which does not bind this Court, inexplicably conjures a lesser *mens rea* from distinctions in the statutory structure that make no substantive difference. Section 1831 does not mention "trade secret" in the preamble and therefore uses the term in each subsection, while section 1832 contains "trade secret" in the preamble and then refers back to that term using "such information" in each subsection. Either way, in both sections 1831 and 1832, the knowledge requirement applies to object of the offense—information that constitutes a trade secret.

The Sixth Circuit case that the prosecution cites, PBR47, *United States v. You*, 74 F.4th 378 (6th Cir. 2023), relied on Justice Alito's dissent in *Rehaif v. United States*, 588 U.S. 225 (2019), to hold that the required knowledge throughout the EEA should be less stringent because it is a "complicated statute with multiple mens rea clauses concerning a complex concept of intellectual property." *You*, 74 F.4th at 394 (citing

*Rehaif* and concluding "[k]nowing that the stolen information is proprietary is enough"). The Sixth Circuit's approach, untethered from the plain statutory language and established canons of construction, is unpersuasive and not entitled to deference.

The prosecution is also wrong to suggest that Congress must have deliberately omitted an actual knowledge requirement from section 1832 because another provision of the EEA specifically includes it. PBR47. The section the prosecution cites, 18 U.S.C. § 1839(5), does not establish elements of a crime but rather defines certain terms of art used elsewhere in the EEA. It provides that "misappropriation" can include, among many other things, "(B) disclosure or use of a trade secret of another without express or implied consent by a person who— . . . (iii) before a material change of the position of the person, knew or had reason to know that— . . . (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake . . . ." 18 U.S.C. § 1839(5)(B)(iii). This hyper-specific subsection of the multi-faceted definition for "misappropriation," limited to accidentally or mistakenly acquired knowledge, supplies no reason to deviate from the plain

language, confirmed in *Flores-Figueroa*, when interpreting the *mens rea* element in other provisions of the EEA that define actual crimes.

Contrary to the prosecution's claim, PBR48, *United States v. Martin*, 228 F.3d 1 (1st Cir. 2000), does not support its argument. That case involved a *conspiracy* to violate section 1832(a)(3), not a substantive violation of the statute. A conspiracy charge does not even "require proof of the existence of an actual trade secret," much less, knowledge of its existence. *Id.* at 13 (quoting *United States v. Hsu*, 155 F.3d 189, 198 (3d Cir. 1998)).

The prosecution points to evidence that Mr. Yu recognized materials at issue were confidential and proprietary, PBR49, but this is not the same thing knowing that it constitutes an actual trade secret. *See Jin*, 833 F. Supp. 2d at 1013 (rejecting prosecution argument that it "need only prove that a defendant knew the information was proprietary, not a trade secret"). Indeed, ADI's own Information Classification Policy expressly treated integrated circuit layout, C[omputer] A[ided] D[esign] data (*e.g.*, GDS files), and tape-out mask data (designs sent to the foundry) as merely "Confidential," a standard distinct from and lesser

than a "trade secret." JA3855. There was insufficient evidence of knowledge to sustain the conviction.

## II. THE DISTRICT COURT ERRED IN DENYING MR. YU'S MOTION TO DISMISS DUE TO UNCONSTITUTIONAL SELECTIVE ENFORCEMENT AND PROSECUTION.

It was no accident that the verdict against Mr. Yu, a naturalized United States citizen of Chinese origin and ethnicity, was the "first ever conviction following a criminal trial of this kind in in the District of Massachusetts." JA787. The record below supplied overwhelming evidence that Mr. Yu was wrongfully singled out for relentless investigation and prosecution because of an illusory "strong nexus to the People's Republic of China." JA838. Statistics, coupled with empirical examples of known cases, established clear evidence of discriminatory effect. And numerous statements by federal law enforcement officials, including the agents and prosecutors who brought this case, provided clear evidence of discriminatory intent. The prosecution's effort to explain away each piece of this cumulative record in isolation, while hiding behind a "demanding" legal standard that has apparently defeated every attempt to bring a selective prosecution claim since the

Supreme Court decided *Yick Wo* in 1886, PBR14, should not blind this Court to what actually happened here.

## A.     Legal Standard[9]

The prosecution complains that Mr. Yu "conflates his selective prosecution and enforcement claims," PBR12 n.6, but then goes on to acknowledge, "the two prongs of a selective enforcement claim mirror those of a selective prosecution claim." PBR19 (citing *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006)). Both claims "draw on 'ordinary equal protection standards.'" *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). To prevail, Mr. Yu must prove both "discriminatory effect" and "discriminatory intent." *Wayte*, 470 U.S. at 608.

---

[9] The prosecution acknowledges, PBR12, as Mr. Yu noted in his Opening Brief, YBR41, that while this Court has not stated a standard of review on appeal from denial of selective prosecution or enforcement claims, the Second and Eleventh circuits review factual findings for clear error and legal conclusions *de novo*. The prosecution also erroneously claims the Sixth Circuit has applied abuse of discretion review. But in fact, *United States v. Jones*, 399 F.3d 640 (6th Cir. 2005) stated: "A district court's failure to dismiss an indictment is generally reviewed for an abuse of discretion. *However, because the determination of the merits of a selective prosecution claim is essentially a factual inquiry, we will review the district court's determination for clear error.*" *Id.* at 644 (emphasis added).

The prosecution also faults Mr. Yu's Opening Brief, PBR14, for not quoting this language in *Armstrong* verbatim: "In order to dispel the presumption that a prosecutor has not violated equal protection a criminal defendant must present *clear evidence* to the contrary." 517 U.S. at 465 (emphasis added) (internal citation and quotation marks omitted). But Mr. Yu expressly acknowledged that selective prosecution requires a heightened showing under *Armstrong* because federal prosecutors are "protected by a powerful privilege" and a "presumption of constitutional behavior," which do not apply to selective enforcement claims against agents. YBR45-46 (citing *Armstrong* and *United States v. Davis*, 793 F.3d 712, 720-21 (7th Cir. 2015)). Mr. Yu identified the controlling cases, did not "completely ignore" the substantive standard,[10] and consequently there was no waiver.[11]

---

[10] Moreover, it is "doubtful there is such a standard of proof as 'clear evidence,'" unlike, for example, "the term 'clear and convincing' evidence," which is "familiar and well-defined." *Mandel v. Boston Phoenix, Inc.*, 492 F. Supp. 2d 26, 27 (D. Mass. 2007) (examining Supreme Court's usage of the phrase "clear evidence" in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)).

[11] In *Alston v. International Association of Firefighters, Local 950*, 998 F.3d 11, 25 (1st Cir. 2021), cited by the prosecution, PBR14, the Court found a statutory claim under 42 U.S.C. § 1981 was waived where "the only reference to section 1981 in appellate briefing appears in an

Whatever standard is applied, the record here supports dismissal for both selective prosecution and selective enforcement.

## B.    Clear Evidence Established Discriminatory Effect.

The prosecution makes unavailing efforts to rebut the "control group" comparisons, which confirm the statistical conclusions that observers have drawn about anti-Chinese bias in criminal prosecutions for alleged trade secret offenses.

Regarding the MACOM case, the prosecution contends the former ADI employees in that case were not "similarly situated" because there is "no information that indicates there was evidence to back up ADI's allegation" that the former employes stole its trade secrets. PBR15 (emphasis in original). The prosecution never made that argument below, and it is untrue. The MACOM complaint was detailed and specific.  For example, it alleged:

> • In the weeks before joining MACOM, and in violation of his confidentiality agreements with ADI, the employees "secretly and without authorization downloaded approximately 500GB of data to at least 19 external devices (including 4

---

explanatory parenthetical to a cited case." Here, Mr. Yu has discussed the bases of his constitutional equal protection claims and the controlling cases at length in his briefs.

hard drives," and those stolen trade secrets included ADI's "confidential and proprietary information, such as design and layout files, schematics and simulations related to various products, including but not limited to MMIC amplifier products." JA129.

- When ADI learned of these downloads, it contacted the employees, one of whom later "signed a document certifying that he copied Analog's confidential information to portable hard drives, some of which he took with him after leaving employ of Analog" and "had, indeed, put certain of those Analog files into his MACOM-issued laptop." JA130.

ADI also submitted voluminous sworn declarations and exhibits in support of both its complaint and a motion for preliminary injunction. *See Analog Devices, Inc. v. Macom Tech. Solutions Holdings, Inc.*, No. 18-cv-11028 (D. Mass.), DE1,24,25,26,27,28. The remarkable similarity between this case and the MACOM case makes the inference of bias inescapable. At around the same time, individuals who were not ethnically Chinese stole even more of the same technology, from the same company, to assist an even bigger competitor (which had a substantial footprint in China), but they faced no criminal charges. They apparently were not even investigated. Instead, the two companies settled a civil case, and the individuals faced no personal liability.

The prosecution also contends, YBR15, there was no evidence that ADI made unlicensed export of GDS design files. Not so. *See* DE227 at 3-4 (description of documents demonstrating that ADI did not start obtaining licenses to send GDS files to the foundry until March 2015, despite contrary prior representations to the government and defense). And the fact that GDS files Custom MMIC (Blount) exported did not contain stolen trade secrets, PBR16, is irrelevant because it is the unlicensed export of controlled technology, regardless of ownership, that is allegedly unlawful. Mr. Yu argued below, and the jury apparently agreed, that sending GDS files to a foreign chip foundry, which already possesses the "technology" at issue, does not require an export license. But the fact that authorities brought this novel theory of prosecution against Mr. Yu, and not others who did the same thing, including ADI and Custom MMIC (Blount), is clear evidence of disparate treatment.

## C. Clear Evidence Established Discriminatory Intent.

The prosecution's response to evidence of discriminatory purpose boils down to an argument that "having ties to China is not a suspect classification under the Equal Protection Clause." PBR26. If the Court

accepts this argument, supposed "ties" would become a pernicious proxy for national origin and ethnic heritage that eviscerates equal protection.

When agents opened their "full economic espionage investigation," JA839, they had no reason to suspect that Mr. Yu actually did anything to benefit a "foreign government, foreign instrumentality, or foreign agent." The industry "tips" provided meagre basis to suspect any actual wrongdoing, much less international "espionage."

As for the supposed "strong nexus to the People's Republic of China," JA838, the prosecution points to nothing other than the national origin of Mr. Yu and his wife, his degree from the prestigious Tsinghua University earned nearly two decades earlier, and a handful of visits to China where his elderly parents and in-laws reside. The suggestion that such commonplace connections, taken together, attain a critical mass that warrants suspicion of nefarious loyalty to a foreign government should be deeply chilling to the tens of thousands of highly-skilled Tsinghua alumni who live, work, and study in the United States, to say nothing of the nearly 5.6 million individuals who comprise the American

Chinese diaspora,[12] many of whom are native-born or naturalized citizens and nevertheless retain close familial ties to China.

### D. The District Court Erred in Denying the Motion to Dismiss.

The district court's finding of implicit bias should have sufficed to trigger dismissal. Even if it does not, the district court's finding that there was no "explicit discrimination" was clearly erroneous in light of the evidence.

The prosecution concedes that the key language in *Wayte* "concerned what is required to show that a discriminatory effect (if one exists) was motivated by a 'discriminatory purpose.'" PBR22 (emphasis in original). The Supreme Court stated that "[d]iscriminatory purpose" exists where "the decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610. This language closely matches the district court's finding here that bias against Mr. Yu's

---

[12] *See* Madeleine Greene and Jeanne Batalova, *Chinese Immigrants in the United States*, Migration Policy Institute (Jan. 15, 2025), *available at* https://tinyurl.com/5dvpm96t.

Chinese heritage, "certainly did not help him and . . . it *played a role* in part in what happened here." ADD52 (emphasis added).

Respectfully submitted,

**HAOYANG YU**

By his attorneys,

/s/ *William Fick*
William W. Fick (1st Cir. # 82686)
Daniel N. Marx (1st Cir. # 1150876)
Amy Barsky (1st Cir. # 1174212)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM
ABARSKY@FICKMARX.COM

Dated: April 16, 2025

## CERTIFICATE OF COMPLIANCE

I, Willliam W. Fick, counsel for Defendant-Appellant Haoyang Yu, certify that this Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because excluding the parts exempted by Fed. R. App. 32(f), it contains 6,497 words and, also, with the type-face and type-style requirements of Fed. R. App. P. 32(a)(5)-(6), because it has been prepared in a proportionally spaced type-face using 14-point Century Schoolbook in Microsoft Word.

/s/ William W. Fick
William W. Fick

**CERTIFICATE OF SERVICE**

I, William W. Fick, counsel for Defendant-Appellant Haoyang Yu, certify that, on April 16, 2025, I caused this Brief, and the accompanying Addendum, to be served electronically through the ECF system on the registered participants, including AUSAs Karen Eisenstadt, Donald Lockhart, Nadine Pellegrini, Amanda Beck, and Jason Casey, as identified on the Notice of Electronic Filing.

*/s/ William W. Fick*
William W. Fick
